**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WFMT, A DIVISION OF CHICAGO EDUCATION TELEVISION ASSOCIATION, Respondent.**

No. 91–3731.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1992.

Decided June 21, 1993.

Before COFFEY and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

On January 16, 1991, the National Labor Relations Board ("NLRB" or "Board") certified the American Federation of Television and Radio Artists Union ("AFTRA" or "union") following its victory in a representation election as the bargaining representative of the employees at WFMT ("Company"), a division of Chicago Education Television Association. The Company refused to bargain with the union, even though AFTRA had been certified. AFTRA filed an unfair labor practice charge with the NLRB, alleging that WFMT had violated § 8(a)(1) and § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (a)(5), in refusing to bargain with and provide bargaining-related information to the union. The Board issued its Decision and Order on August 27, 1991, finding that the Company committed the violations alleged by AFTRA. The National Labor Relations Board petitions the court for the enforcement of its Decision and Order requiring WFMT to bargain with AFTRA. We enforce the Order.

## I. FACTS

WFMT employees Lois Baum, Mel Zellman and Robert Crawford met with Attorney Gilbert Cornfield on four occasions from November 1989 to January 1990 to discuss the procedures involved in filing a petition for union certification with the NLRB. Attorney Cornfield explained to the three employees that they were required to file a petition with the NLRB demonstrating that their union had a minimum 30 percent "showing of interest" to be listed on the ballot in an NLRB-run representation election. The Board's *Casehandling Manual*, § 11022.3(a), states that the showing of interest designates the petitioning union, if elected, as the bargaining agent of the employees in the bargaining unit. On January 12, 1990, Baum, Zellman, and Crawford filed a petition demonstrating 30% support from the WFMT Employees union (known as "WE") as the

Jill A. Griffin (argued), N.L.R.B., Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, N.L.R.B., Chicago, IL, Aileen A. Armstrong, Collis Suzanne Stocking, Nancy B. Hunt, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for petitioner.

Gilbert A. Cornfield, Cornfield & Feldman, William L. Becker, Michael Klupchak (argued), Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, for respondent.

bargaining representative for all full-time and regular part-time Chicago-based WFMT employees. At the time WE filed the representation petition, it was a loosely structured organization without a constitution, much less bylaws, officers or any financial resources. Subsequent to WE's representation petition, AFTRA made a motion to intervene in WE's "Petition for Representation" requesting that the NLRB allow it to appear on the election ballot. The NLRB granted AFTRA's motion to intervene on February 2, 1990, approving AFTRA's intervention not as a full intervenor, but one reflecting less than a 10% showing of interest. WE and AFTRA agreed to and filed a Stipulation with the NLRB that both unions be named on the ballot.

When AFTRA intervened in the representation election, the WFMT employees who launched WE transferred their support from WE to AFTRA in the March 1, 1990 election. WE did no more campaigning before the union election. AFTRA used its staff, as opposed to a committee of WFMT employees, to conduct its organizing campaign. WFMT employees Crawford, Zellman, Baum, Louis "Studs" Terkel, and Kay Richards together contributed between $3000 and $4000 into an Initiation Fee Fund to pay the AFTRA Initiation Fee for those employees financially unable to afford the $300 fee. AFTRA representative Paul Wagner, who supervised the AFTRA union organizing drive at WFMT, testified that AFTRA neither authorized nor was aware of the Initiation Fee Fund.

On March 1, 1990, the representation election was held between 1:00 p.m. and 3:00 p.m. Nineteen votes were cast for AFTRA, no votes were cast for WE, and eighteen votes were cast against union representation without any ballots being challenged in the one-vote AFTRA victory. During the voting period WFMT employee Carol Martinez served as WFMT's election observer. AFTRA had three election observers: Jackie Stevenson from 1:00 p.m. to approximately 2:00 p.m.; Studs Terkel from 2:00 p.m. until approxi-

mately 2:30 p.m.; and Lois Baum replaced Terkel from approximately 2:30 p.m. to 3:00 p.m. Baum took Terkel's place after informing him that he had an urgent telephone message from his wife. Terkel claims that he immediately left the polling place to return his wife's call. The NLRB found that when Baum replaced Terkel as an election observer, Terkel transferred his official election "Observer" button to Baum and she put on the button.

Martinez, WFMT's election observer, testified that during a time when no eligible voters were present in the polling place, she observed Terkel reviewing the official list of eligible voters and that he commented that several employees had not yet voted. At approximately 2:20 p.m., employee Lynn Minich, who had previously voted, arrived at the polling area to speak with Terkel. As Minich was leaving, Terkel said to her, "Kurt Tyler hasn't voted. Go get Kurt to come and vote." The Board agent, John Peck, who obviously overheard the comment while serving as the NLRB's election observer, instructed Minich not to tell anyone to vote and informed Terkel that he could not tell Minich to get a WFMT employee to vote.

When Baum replaced Terkel as the AFTRA observer, the Board agent did not give her "election Observer instructions" detailing how an observer is required to conduct him or herself.[1] While Baum served as the AFTRA election observer, she greeted some of the voters (seven) by name as they entered the polling area to vote. After Terkel left the polling area, allegedly to return his wife's telephone call, employee Ann Lee testified that she observed Terkel walking down the corridor at approximately 2:55 p.m. and heard him state: "Where is Mary Gaffney? She hasn't voted yet and there is only five minutes. Where the hell is Mary Gaffney?" (All this occurred after Terkel had reviewed the list of eligible voters and noted those who had failed to cast their ballot.) Terkel attempted to explain his statements regarding

**1.** The NLRB's *Casehandling Manual* § 11326.2 states:

"Election observers may not electioneer during their hours of duty, whether at or away from the polling place. In order to remove any

possibilities of electioneering, an *observer away from the polling place* for any reason during his/her duty hours should be accompanied by observers representing the other parties." (emphasis added).

Gaffney as being related to a 4:00 p.m. radio interview he thought he had with the President of the Chicago League of Women Voters. Terkel testified that he stated something like, "Where is Mary Gaffney," in the WFMT corridors to find Gaffney to act as his engineer for the radio interview. Lee testified that Terkel had a habit of "talk[ing] to himself when he is walking around the station" and often talks out loud in the WFMT hallways when he needs to find a WFMT employee. Gaffney voted between 2:45 p.m. and 2:50 p.m. She stated that she did not have any contact with Terkel during the voting period prior to voting.

WFMT employee Barry Hochman stated in the Board hearing that at approximately 2:50 p.m. on election day he heard Terkel say outside Production Room 2, "You have got to go vote, you haven't voted yet." Hochman testified that he did not actually see Terkel making this statement to anyone and thus does not know to whom it was addressed, but shortly thereafter Terkel appeared in the doorway of Production Room 2 and berated him (Hochman) for his anti-union views. Early that day, Hochman had written and distributed a memo throughout the station, warning employees about the possibility of union-called strikes if a union was elected. (Terkel had circulated three pro-union memos to his fellow employees.) Hochman testified that Terkel sarcastically told him in the doorway of Production Room 2 that the anti-union memo was "brilliant" and devious, in that it played on people's worst fears about union-called strikes.

## II. BOARD DECISION AND ORDER

In its "Objections to Conduct Affecting the Election" the Company claimed that numerous violations occurred during the representation election and requested that the Board set aside the election in favor of AFTRA. The Board[2] found (1) that Terkel did not keep a list of eligible voters at the polling place but merely reviewed the official NLRB list of eligible voters; and (2) that Terkel did not engage in unlawful electioneering while

in the WFMT corridors when he stated to Minich inside the polling area to get Tyler to vote, called out for Gaffney, and made statements to Hochman. Concerning Hochman's claim that he overheard Terkel allegedly telling an unidentified WFMT employee to vote, the Board found that Hochman's testimony was obscure and speculative in light of Lee's testimony that Terkel often speaks to himself when walking the WFMT hallways and the fact "there is no evidence that Terkel ever told anyone to vote." The Board also found that the Initiation Fee Fund was permissible because (1) the employees who created and managed the Fund were not acting as agents of the AFTRA union; and (2) AFTRA did not authorize or have knowledge that the Fund existed. The Board also found that there was "no evidence that the failure of the Board Agent to give Baum observer instruction caused her to engage in any improper objectionable conduct." The Board concluded that the Board agent did not undermine the parties' confidence in the election or raise questions concerning the Board's neutrality. Additionally, the Board found that since the WFMT Employees union ("WE") did not withdraw its petition demonstrating a 30% showing of interest from the WFMT employees, AFTRA was permitted to "intervene" in the March 1, 1990 election with less than a 30% showing of interest. Finally, the Board found that the cumulative effect of the Company's objections was insufficient to overturn the election results.

## III. ISSUES

The Company argues that AFTRA's election as the WFMT employees' bargaining representative should be set aside because: (1) Terkel unlawfully monitored the official list of voters to keep track of which employees had not voted and engaged in last-minute electioneering during the election; (2) AFTRA and its supporters promised an economic benefit to eligible voters in creating a monetary fund to pay AFTRA's union initiation fees; (3) the NLRB's Agent failed to ensure that the laboratory conditions at the

---

2. An NLRB hearing officer heard testimony in the case and recommended that the Company's objections to the election be rejected and that a

certification of representation issue to the union. The Board adopted the hearing officer's findings and recommendations in their entirety.

polling place existed to permit a free and open election without interference; (4) AF-TRA failed to meet the 30% showing of interest requirement to be named on the representation election ballot; and (5) the cumulative effect of WFMT's objections and the closeness of the election vote in favor of AFTRA warrants setting aside the election.

## IV. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to consider the Board's petition under 29 U.S.C. § 160(e), which provides our standard of review: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." Thus, our "review of the Board's order is sharply limited." *Livingston Pipe & Tube, Inc. v. NLRB*, 987 F.2d 422, 426 (7th Cir.1993). "We must uphold the Board's determination if its factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in the law.... Substantial evidence in this context means such relevant evidence as a reasonable mind might accept as adequate to support the Board's determination." *Id.* (citation omitted). This standard "does not allow us to dabble in fact-finding and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case *de novo*." *Id.* (quoting *N.L.R.B. v. P*I*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir.1991)). We must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life. *Id.* (citation omitted). We are bound to "uphold the legal conclusions of the Board unless they are irrational or inconsistent with the National Labor Relations Act." *National Labor Relations Board v. Augusta Bakery*, 957 F.2d 1467, 1471 (7th Cir.1992) (citation omitted).

## V. ALLEGED UNLAWFUL ELECTION DAY CONDUCT

A Board-run representation election is presumed valid and the burden is on the objecting party to prove that the election is invalid. *N.L.R.B. v. Service American Corp.*, 841 F.2d 191, 195 (7th Cir.1988); *N.L.R.B. v. Mattison Machine Works*, 365 U.S. 123, 124, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961). WFMT, as the objecting party, must demonstrate not only that unlawful acts occurred, but that those acts interfered with the employees' exercise of free choice "to such an extent that they materially affected the results of the election." *N.L.R.B. v. Chicago Tribune Company*, 943 F.2d 791, 794 (7th Cir.1991) (citation omitted).

### A. Alleged Unlawful Electioneering Inside the Polling Area

The Company contends that Terkel engaged in last-minute electioneering *inside the polling area* in violation of the rule in *Michem, Inc. and Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 864*, 170 N.L.R.B. 362 (1968), when he stated to Lynn Minich, "Kurt Tyler hasn't voted. Go get Kurt to come and vote." In *Michem*, the NLRB prohibited electioneering during a representation election:

> "Careful consideration of [the effect of conversations between parties to the election and employees preparing to vote] now convinces us that the potential for distraction, *last-minute electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct*, without inquiring into the nature of the conversations. The final minutes before an employee casts his vote should be his own, as free from interference as possible. Furthermore, the standard here applied ensures that no party gains a last-minute advantage over the other, and at the same time deprives neither party of an important access to the ear of the voter.... *This rule is nothing more than a preventative device to enforce the ban against electioneering in polling places normally applied in political elections and in our representation elections.*"

*Michem*, 170 N.L.R.B. at 362–63 (emphasis added). The Board will normally set aside a representation election if the parties have

violated the *Michem* rule against electioneering. *N.L.R.B. v. Del Rey Tortilleria, Inc.*, 823 F.2d 1135, 1140 (7th Cir.1987) (citations omitted); *Midwest Stock Exchange v. N.L.R.B.*, 620 F.2d 629, 633 (7th Cir.1980). The Company argues that Terkel's statement to Minich constituted a "conversation" that could develop into electioneering or coercion as it potentially sent a message to other employees that someone was monitoring who had voted and might seek out those employees who had not yet voted. In addition, the Company labels Terkel's statements directing Minich to get Tyler to vote unlawful electioneering because Minich was standing in an open doorway while "talking" to Terkel, permitting other potential voters to overhear Terkel's statement and feel last-minute pressure to vote. Under the *Michem* rule, "the Board will normally set aside an election if there are 'prolonged conversations between representatives of any party to the election and voters waiting to cast ballots....'" *Del Rey Tortilleria*, 823 F.2d at 1140 (quoting *Michem*, 170 N.L.R.B. at 362).

We agree with the Board's conclusion that Terkel's statement to Minich, to "go get Kurt [Tyler] to come and vote," did not violate the *Michem* rule because Minich was not waiting to cast her ballot, and no other eligible voters were present in the polling area when Terkel made the statement. Moreover, the Board agent immediately cautioned Terkel and Minich that she (Minich) could not instruct an employee to vote. Tyler testified that he voted without anyone telling him to vote. There is no testimony in the record that any other WFMT eligible voters, other than Martinez (WFMT observer), Stevenson and Baum (AFTRA observers) serving at the polls, overheard Terkel's statement to Minich and felt influenced or pressured to vote in the election. Because the Company failed to establish that Terkel's statement to Minich influenced or interfered with voters waiting to cast their ballots, the Board's finding that Terkel's statement did not violate the *Michem* rule is supported by substantial evidence.

### B. *Alleged Electioneering Outside the Polling Area*

The Company argues that Terkel engaged in three instances of unlawful electioneering outside the polling area. In the first instance, the Company contends that when Terkel was searching for Gaffney, he engaged in unlawful electioneering by stating in the WFMT corridors, "Where is Mary Gaffney? She hasn't voted yet and there's only five minutes. Where the hell is Mary Gaffney?" In particular, the Company states that WFMT employees Ann Lee and Jackie Stevenson interpreted Terkel's searching for Gaffney as seeking out voters because after Terkel passed Lee in the corridor, Lee commented to Stevenson, "I thought you weren't supposed to talk about that," whereupon Stevenson replied, "You are not." Without a Board observer accompanying Terkel, the Company contends that other WFMT employees like Lee and Stevenson could have perceived Terkel's calling out for Gaffney as "looking for voters." Second, the Company contends that Terkel's statements to Barry Hochman concerning the anti-union memo that Hochman had circulated on election day also constituted unlawful electioneering. Hochman testified in the Board hearing that his conversation with Terkel about the anti-union memo took place at approximately 2:50 p.m. with the door to Production Room 2 wide open, enabling other WFMT employees who had not yet voted to overhear Terkel's pro-union comments before the close of the election polls at 3:00 p.m. Third, the Company alleges that Hochman overheard Terkel telling an unidentified person, "You have got to go vote, you haven't voted yet," in violation of the *Michem* rule against electioneering. The Company maintains that although Terkel may not have literally stated to Gaffney, Hochman or the unidentified WFMT employee, "you have got to go vote *for the union*," his statements directed to these employees were the equivalent of ordering them to cast a ballot. The Company maintains that Terkel had not been relieved from his duties as AFTRA's election observer at the time he walked the WFMT corridors because the Board agent did not release him from his election observer position when he left the polling place. Since Terkel remained AFTRA's election observer and seven employees still had not voted when Terkel left the

polling place (for an alleged emergency call to his wife) and made the alleged statements, the Company asserts that other WFMT eligible voters could have been misled or pressured by Terkel's statements into believing that they were required to vote. Finally, the Company argues that Terkel's conduct was sufficiently objectionable to require a second election because he was acting as AFTRA's agent when he made statements to Gaffney, Hochman, and the alleged unidentified WFMT employee in the radio station's corridors. Given the fact that there was no formal in-house organizing committee at WFMT, the Company contends that eligible voters might very well have believed Terkel was acting as AFTRA's agent when he spoke to co-workers and circulated memos urging the employees to vote for AFTRA.

■ We will not overturn the Board's findings that Terkel's statements concerning Gaffney, Hochman and the unidentified WFMT voter fail to constitute electioneering because there is no evidence that the eligible voters, who had not as yet voted, overheard Terkel's statements. Gaffney testified that she did not have any contact with Terkel until after the election polls were closed and therefore Terkel could not have influenced her vote. Further, the record supports the Board's finding that Hochman had voted prior to his conversation with Terkel. The Company has submitted no evidence that any eligible voters, who had not yet voted, overheard the Hochman–Terkel conversation about Hochman's anti-union memo. Finally, we note the only evidence in the record supporting the Company's claim that Terkel told an unidentified WFMT employee to vote is Hochman's testimony. Since Hochman was unable to identify any employee that Terkel allegedly told to vote and there is evidence in the record demonstrating that Terkel has a habit of talking out loud, we uphold the Board's conclusion that Terkel's statements did not constitute unlawful electioneering in violation of *Michem.*

■ Based on controlling precedent, we agree that the election should not be set aside on the Company's claim that Terkel was AFTRA's agent when he made the complained of statements in the WFMT corri-

dors. "The test of agency in the union election context is stringent, involving a demonstration that the *union* placed the employee in a position where he appears to act as its representative." *Tuf–Flex Glass v. N.L.R.B.,* 715 F.2d 291, 296 (7th Cir.1983) (citation omitted). Terkel held no position with the union, performed no function at or arranged union meetings, and was not authorized to speak on behalf of the union. Terkel was one of a number of WFMT employees who spoke out either in favor of or against union representation, rendering his letters and remarks in support of AFTRA as the typical activities of a union supporter. In addition, AFTRA used only its union staff to conduct the organizing campaign at WFMT. We uphold the Board's determination the Terkel was not an AFTRA agent.

### C. Terkel's Consultation of the Voter Eligibility List

■ The Company argues that Terkel engaged in unlawful electioneering because his references to the official list of eligible voters was equivalent to keeping a prohibited list, separate from the official list, of those employees who had not yet voted during the election in violation of the rule in *Piggly–Wiggly # 011,* 168 N.L.R.B. 792, 792–93 (1967). *See Medical Center of Beaver County, Inc. v. N.L.R.B.,* 716 F.2d 995, 999 (3rd Cir.1983). We have recognized that shortly after the scheduling of an election, the employer must furnish a list of the names and addresses of all employees eligible to vote. *N.L.R.B. v. Speedway Petroleum,* 768 F.2d 151, 157 and n. 6 (7th Cir.1985) (citing *Excelsior Underwear, Inc.,* 156 N.L.R.B. 1236 (1961)). This official list of employees eligible to vote has become known as an *Excelsior* list. *Id.* In *Piggly–Wiggly,* the Board stated "[i]t has been the policy of the Board to prohibit anyone from keeping any list of persons who have voted, aside from the official eligibility list used to checkoff voters as they receive ballots." *Piggly–Wiggly,* 168 N.L.R.B. at 793; *see also Textile Service Indus.,* 284 N.L.R.B. 1108, 1109 (1987); *Medical Center,* 716 F.2d at 999. The federal courts have generally recognized that "[i]n the interests of ensuring free, non-coerced

elections, the Board has set aside elections 'if employee voters know, or reasonably can infer, that their names are being recorded' on unauthorized lists." *Days Inn Management Co. v. N.L.R.B.*, 930 F.2d 211, 215 (2nd Cir.1991) (citation omitted). ·

The record contains substantial evidence, which we enumerate below, supporting the Board's finding that Terkel's consultation with the official list failed to "constitute objectionable conduct" under the *Piggly–Wiggly* rule. The WFMT observer, Martinez, testified that Terkel did not keep a separate list or refer to any "piece of paper" other than the official list while serving as the AFTRA observer. As an election observer, Terkel's references to the official list were permissible since this list is placed in the joint custody of the election observers, and it is their duty to maintain it. *See N.L.R.B. v. A.J. Tower Co.*, 329 U.S. 324, 326, 67 S.Ct. 324, 325, 91 L.Ed. 322 (1946); N.L.R.B. Form 722 "Instructions to Election Observers." Martinez also stated that no eligible voters were present in the polling area at the time Terkel commented on who had not voted. Moreover, as we have observed earlier, Minich had voted prior to the time Terkel instructed her to get Tyler to vote. Tyler testified he voted without instruction from anyone. Terkel's reference to Gaffney's having not voted and the fact that only five minutes remained before the election polls closed, within earshot of Lee and Stevenson, is far from "communicating" that Gaffney's name is on an unauthorized list of employees who have not voted. Concerning Hochman, the record fails to establish that Terkel told an unknown employee to vote and Hochman himself had voted prior to overhearing Terkel's alleged statement to the unidentified employee. We conclude there is substantial evidence in the record supporting the Board's decision that Terkel's comments regarding certain employees on the official list did not constitute unlawful electioneering in violation of the rule in *Piggly–Wiggly* because, although Terkel's behavior was highly

inappropriate, the Company was unable to come forth with any evidence that it influenced the vote of any employee.

## VI. AFTRA INITIATION FEE FUND

The Company argues that the establishment of a monetary fund by WFMT employees Baum, Zellmann, Crawford and Terkel, to pay the $300. AFTRA initiation fees for those WFMT employees who were financially unable to afford the fees warrants setting aside the election because the Initiation Fee Fund was an impermissible promise of a benefit.[3] The NLRB has stated that it will order new elections where a union grants benefits to employees that could have the effect of creating a sense of obligation to vote for the union and thereby affect the outcome of the election. *S & C Security, Inc.*, 271 N.L.R.B. 1300–01 (1984).

We agree with the Board's conclusion that the evidence in the record concerning the existence of the Initiation Fee Fund was insufficient to set aside the representation election. In *N.L.R.B. v. Savair*, 414 U.S. 270, 277, 94 S.Ct. 495, 499, 38 L.Ed.2d 495 (1973), the Supreme Court held that a union's offer to waive initiation fees conditioned on an employee's joining the union *before* the election unjustly allowed the union to "buy endorsements and paint a false portrait of employee support during its election campaign," thus warranting the setting aside of an election. Unlike the union's offer in *Savair*, the employee-organizers offer to waive AFTRA's initiation fees was not a condition of an employee's joining the union before the election. Because the Fund was available for *all* employees in the bargaining unit, the offer to waive initiation fees did not rise to the level of unjustly allowing the union to "buy endorsements and paint a false portrait of employee support during its election campaign." *See Savair*, 414 U.S. at 274 n. 4, 94 S.Ct. at 499; *Certain–Teed Products, Corp. v. N.L.R.B.*, 562 F.2d 500, 503 (7th Cir.1977). In addition, according to the record, a few

---

**3.** The memorandum announcing the Initiation Fee Fund stated:

"If you are worried about the AFTRA Initiation Fee, you should know *that concerned staff members ... have pooled resources into a fund,* specifically to help pay the $300 AFTRA fee for those WFMT staff members who feel it would be an undue burden."

(emphasis added). This memo was distributed to all WFMT employees.

WFMT employees, rather than the AFTRA union, offered to pay the AFTRA initiation fee which further distinguishes the instant case from *Savair* where the union impermissibly offered to waive initiation fees.

Second, the record supports the Board's finding that the employees who created and managed the Fund were not acting as agents of the AFTRA union because neither AFTRA nor Wagner authorized or had knowledge that the Fund existed. Wagner testified that AFTRA was unaware of the Fund and the union in no way organized or managed the Fund. Since the Company has failed to demonstrate that AFTRA was involved in creating, managing or authorizing the Initiation Fee Fund, we refuse to consider the WFMT employee-organizers of the Fund as special agents of AFTRA. Accordingly, the election results will not be set aside based on the Company's claim that the employee organizers of the Fund were special agents of AFTRA.

## VII. THE BOARD AGENT'S CONDUCT

■ The Company argues that the election should be set aside because of the conduct of the Board's agent at the polling place on the day of the election. The Company points out that Board Agent Peck, in violation of § 11326.2 of the *Board's Casehandling Manual,* (see footnote 1), permitted Terkel to leave the polling area unescorted by an election observer, allegedly to return his wife's urgent telephone call. The record demonstrates that Terkel left the polling area at approximately 2:30 p.m. to answer his wife's telephone message and did not return to the polling area. The Board agent's failure to observe the Board's rules and have Terkel escorted out of the polling place to ensure his only activity once leaving the polls was to return his wife's alleged telephone call was a serious breach of the Board's obligations. Nevertheless, as we stated earlier, there is substantial evidence in the record to support the Board's finding that Terkel's statements outside the polling place did not influence any voters. Therefore, the fact that Terkel was allowed to roam the WFMT halls unescorted, although a troubling breach

of the Board's procedure, is not enough to overturn the election result.

■ Second, the Company argues that Board agent Peck's failure to give "election Observer instructions" to Baum when she replaced Terkel at the polls led to Baum improperly greeting voters by name. Baum's greeting of voters is suspect because her contact with employees minutes before they cast their ballots treads very close to the Board's *Michem* rule that strictly prohibits prolonged conversations with voters waiting to cast their votes in the polling place. *Midwest Stock Exchange v. N.L.R.B.,* 620 F.2d 629, 634 (7th Cir.1980); *Michem,* 170 N.L.R.B. at 362–63. As we stated in *Midwest Stock Exchange,* "voters [s]hould not be distracted during the final minutes before they cast their vote. These last few moments before voting ... should be the voter's own, 'as free from interference as possible'; a time during which a voter can consult his own conscience without interruption." *Id.* (quoting *Michem,* 170 N.L.R.B. at 362–63). In *Midwest Stock Exchange,* the union observer, Jonathon James, greeted several voters as they entered the polling place, whispered to one person in line to vote, and in one case held a five minute conversation with a voter standing in the voting line. *Id.* The court held that James' five minute conversation with the waiting voter violated the *Michem* rule against prolonged conversations with voters who could be "distracted during the final minutes before they cast their vote." *Id.* at 633–34. However, Baum's brief greeting to voters is distinguishable from James' conversation with the voter in *Midwest Stock Exchange* because Baum's welcoming of voters was far less than a five minute conversation and failed to rise to the level of a prolonged conversation that interfered with or distracted voters during the final minutes before they cast their vote in violation of *Michem.* The Board concluded that the Board agent's failure to instruct Baum amounted to a minor departure from the *Casehandling Manual's* procedures. Because the Board's conclusion is not irrational or inconsistent with the National Labor Relations Act, we refuse to disturb the Board's decision.

## VIII. THE SHOWING OF INTEREST RULE

The Company claims that WE should have withdrawn from the election, thereby forcing AFTRA to make a 30% showing of interest. Board Statements of Procedure, § 101.18(a); *Montgomery Ward & Co., Inc. v. N.L.R.B.*, 668 F.2d 291, 302 (7th Cir.1981); *Schmerler Ford Inc. v. N.L.R.B.*, 424 F.2d 1335, 1342 (7th Cir.1970); *Mast Advertising & Publishing, Inc.*, 304 N.L.R.B. No. 107 (1991). The Company claims that the "[p]etitioner [WE] ceased to exist after the second or third week in February [1990]" because the leaders of WE abandoned their support for the WFMT Employees ("WE") union and switched their allegiance to AFTRA. Since, according to the Company, WE, through its leaders, in effect withdrew from the election, the Company contends that WE's thirty percent showing of interest as petitioner should have been revoked. Without WE's 30% showing of interest, the Company argues that AFTRA should have been required to demonstrate whether it held a "30% showing of interest" from the WFMT employees to qualify for the election ballot.

The Board concluded that it found "nothing objectionable" to AFTRA participating as an intervenor in the election with less than a thirty percent showing of interest "because WE's petition remained valid as the union took no action to withdraw from the representation election." The Company offers no case law or statutory law to support its argument that WE should have withdrawn from the election because its leaders shifted their support from WE to AFTRA. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) (arguments unsupported by pertinent authority are waived). Moreover, the Company has failed to offer any authority to support its position that WE effectively withdrew from the election. WE did not request to withdraw its petition from the NLRB and failed to raise any objections to AFTRA intervening in the election with less than a 10% showing of interest. No case law has been presented to us, nor have we been able to find any authority that requires a petitioning union to withdraw from the election because

the union failed to promote itself before the election or because another union intervened. Further, the record is barren of any evidence that WE withdrew from the election. WFMT employees Baum and Crawford testified in the Board hearing that they believed some employees would vote for the WE union. Under these circumstances, WE's thirty percent showing of interest was sufficient to support both its participation, as well as AFTRA's participation, in the representation election under § 11022.3(d) of the Board's *Casehandling Manual.*

## IX. CUMULATIVE EFFECT OF THE COMPANY'S OBJECTIONS

WFMT claims that the Board-run representation election should be set aside based on the cumulative effect of its objections to the election and the closeness of AFTRA's one-vote election win. *See N.L.R.B. v. Katz*, 701 F.2d 703, 709 (7th Cir.1983). The Company argues that when all of the objectionable conduct described above is considered in combination with the fact that a mere one-vote swing would have changed the election results, it becomes apparent that the representation election should be set aside. We have held that "[w]hile the size of the unit and the closeness of the vote may be relevant considerations in determining whether free choice was interfered with ... neither fact is sufficient to raise a presumption that the [complained of] conduct had an impact on the election results." *N.L.R.B. v. Browning–Ferris Indus. of Louisville*, 803 F.2d 345, 349 (7th Cir.1986) (citation omitted); *see Van Leer Containers, Inc. v. N.L.R.B.*, 841 F.2d 779, 788 (7th Cir. 1988). When invoking the cumulative impact argument, the Company "must at the very least demonstrate conduct that is legally actionable in its component parts or 'offer the Board detailed evidence of the *pattern the activity* formed and its influence on the election.'" *Browning–Ferris*, 803 F.2d at 349–50 (emphasis added) (quoting *Melrose–Wakefield Hosp. Ass'n v. N.L.R.B.*, 615 F.2d 563, 570 (1st Cir.1980)).

The objectionable conduct that the Company presents reveals a disturbing pattern of activity permitted by the Board rep-

resentative during the election. Terkel's statements both inside and outside the polling place border on electioneering because if he made the statements to eligible voters, those voters might have felt unduly pressured or influenced to vote for a particular union. Moreover, the Board agent's failure (1) to have Terkel escorted when he left the polling place and (2) to give Baum election observer instructions casts a certain amount of doubt on the fairness of the election results since the Board agent's omissions left Terkel free to make statements in the WFMT corridors and Baum to greet voters by name as they entered the polling place. The fact that the AFTRA union was elected as the WFMT employees bargaining representative by a one-vote margin further highlights the importance of scrutinizing the alleged misconduct. When considered individually, each of the Company's objections to the election is insufficient to overturn the election, however, the cumulative effect of these objections might conceivably have interfered with the WFMT voters' right to make a free and fair choice of a bargaining representative without interference from outside sources. *See e.g. Van Leer Containers, Inc. v. N.L.R.B.*, 841 F.2d 779, 788–89 (7th Cir.1988). This is a close question. We must uphold the Board's findings if supported by substantial evidence in the record and we may not disturb the Board's legal conclusions unless they are irrational or inconsistent with the National Labor Relations Act. *Augusta Bakery*, 957 F.2d at 1471; *P\*I\*E\**, 923 F.2d at 513. While we do not condone Terkel's or the Board agent's conduct during the representation election, our deferential standard of review constrains us from holding that the cumulative effect of the Company's objections established a "pattern of activity" that prevented the voters from exercising a "free and fair" choice of a bargaining representative. *See Van Leer*, 841 F.2d at 788–89; *Browning–Ferris*, 803 F.2d at 349–50. The cumulative effect of the election irregularities is thus not sufficient to overturn the election results.

## X. CONCLUSION

The Company has failed to carry its burden and establish that the Board-run repre-

sentation election at WFMT was invalid. The Board's application for enforcement of its August 27, 1991 Decision and Order that WFMT cease and desist from its refusal to bargain with and provide information to AFTRA in violation of § 8(a)(1) and § 8(a)(5) of the National Labor Relations Act is

GRANTED.