28 F.3d 1216
 146 L.R.R.M. (BNA) 2768
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner, Cross-Respondent,
and
Local 743, International Brotherhood of Teamsters, AFL-CIO,
Intervening Petitioner,
v.
LAKEWOOD ENGINEERING & MANUFACTURING, INCORPORATED,
Respondent, Cross-Petitioner.
 Nos. 93-2771, 93-2938.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 15, 1994.
Decided June 23, 1994.
 
 1
 Before COFFEY and FLAUM, Circuit Judges, and MORAN, Chief District Judge.*
 
 ORDER
 
 2
 The National Labor Relations Board (the Board) petitions this court for the enforcement of its Decision and Order of April 23, 1993, requiring Lakewood Engineering & Manufacturing Company, Inc. (Lakewood) to bargain with intervening petitioner Local 743, International Brotherhood of Teamsters, AFL-CIO (the Union), certified as the exclusive bargaining representative of Lakewood's employees following a Board-supervised election. Lakewood cross-petitions, seeking to set aside the order on the grounds that the Union allegedly intimidated voters during the election. We enforce the Board's Order.
 
 BACKGROUND
 
 3
 Lakewood Engineering and Manufacturing, Inc. produces electric fans, heaters, and Christmas tree stands at various sites in Chicago, Illinois. On April 3, 1992, a Board-supervised election was conducted to determine whether the Union was to act as the employees' exclusive bargaining representative.[1] The final tally was 312 votes in favor of Union representation and 197 against it, while thirty-seven votes were challenged and determined to be invalid or improper.
 
 
 4
 Lakewood filed objections to the election's results with the NLRB, claiming it had "discovered objectionable conduct on the part of the Teamsters Local No. 743 which affected the results of the April 3 election." Lakewood alleged that at two of the polling stations, on Carroll Street and Sacramento Street, "Union supporters amassed outside the polling place" and "at all times they were observing, threatening and otherwise coercing employees." Specifically, Lakewood claimed that Union supporters threw stones at two employees (Canamar and Zdzairski) as they left the Carroll Street voting site, shouted slogans with the use of a bullhorn, and photographed employees as they approached and left both the Carroll and Sacramento polling stations, all in an attempt to intimidate voters and prevent them from exercising their free choice. Lakewood also argued that an angry and violent mob of some fifty Union supporters partially blocked the driveway leading to the Sacramento Street parking area by forcing cars to slow down.
 
 
 5
 Based upon Lakewood's allegations, the NLRB assigned a hearing officer to take testimony and make findings and recommendations. With respect to the Carroll Street activities, the hearing officer, relying on the testimony of witnesses Herrera, Canamar, Stanislawski, and Padilla, found that there were "approximately twenty" Union supporters present during the polling period, not fifty as claimed, and that the rally "was not being held to urge employees to vote for the [Union] but rather was in the form of a pep rally for supporters before the ballot count." Although the noise created by the Union supporters (shouting and music) could be heard inside the polling area, "neither of the witnesses who testified ... [stated that] they could hear with any specificity what was said or that it interfered with conversation inside the polling place." The hearing officer also rejected the cross-petitioner's contention that stones were thrown at Zdzairski as he walked from the Carroll Street polling station to employee Canamar's van, finding that Zdzairski was not a credible witness and observing that no one else had testified that anything was thrown at Zdzairski. However, the NLRB hearing officer did find that an object was thrown at Canamar's van as he and Zdzairski drove away. This finding is at best questionable for it is just as likely that the object was thrown at the passengers inside the vehicle, rather than at the vehicle itself. The hearing officer concluded that the throwing incident had no "coercive effect" on the election because it "involved only two employees out of 540, occurred after they had voted, and could not have been disseminated among any employees as this was the last polling session and only polling place open." One is left to contemplate as to whether the throwing of stones would indicate future violence which in turn might very well have intimidated others who either saw or heard about the stone-throwing incident and had not as yet cast their ballots. In addition, the NLRB officer found that Jose Galvan, a Union supporter, took pictures during the rally at the Carroll Street location, but did so, according to his testimony, for the purpose of including the pictures in the Union publication; the hearing officer concluded that taking pictures of Union supporters did not constitute objectionable conduct. Although he recognized that Galvan had also taken a photograph of employees not participating in the rally, the factfinder failed to make any findings as to whether the taking of this picture had a coercive effect on other employees.
 
 
 6
 With respect to the Sacramento Street activities, the hearing officer found that according to the testimony he relied upon, the Union had eight to twelve "representatives and supporters" present and that "these people were waving [Union] banners and urging employees to vote for the [Union]." In his reasoning he explained that rather than being a mob-scene, as stated in the pleadings, the Union supporters simply held a rally as they had done at the Carroll Street facility. In response to Lakewood's contention that Union supporters partially blocked the driveway leading to the Sacramento Street polling station and forced cars to slow down, the hearing officer stated, "Only one witness, Sylvia Garcia, testified that the driveway was ever blocked. In view of the overwhelming testimony of all other witnesses I do not credit Garcia's testimony that the driveway was blocked by [Union] supporters." However, it is to be noted that Garcia did not testify that the driveway was blocked but only that the driveway was partially blocked, and it is rather obvious that any driveway that is partially blocked with human beings or other vehicles during a labor conflict is somewhat hazardous and can be intimidating. Finally, the hearing officer found that although another Union supporter, Rico Cristo, had also taken pictures, the camera was used to photograph Union supporters, and that there was no evidence that Cristo photographed employees approaching the Sacramento polling station or anyone other than Union supporters.[2] The hearing officer recommended to the Board that the Union be certified as the Lakewood employees' exclusive collective bargaining representative.
 
 
 7
 Lakewood objected to the hearing officer's findings of fact and recommendation. On November 4, 1992, a three-member panel of the Board adopted the hearing officer's findings and recommendations and certified the Union as the employees' collective bargaining representative. In response to the employer's assertion that Galvan's photograph of the employees in the darkened tool room required that the election be set aside, the Board stated that "the single photo ... was an isolated event that does not warrant setting aside the election." After being so certified, the Union attempted to bargain with Lakewood, but Lakewood refused to bargain with the Union or provide the Union with bargaining-related information. Subsequently the Union filed an unfair labor practice charge with the Board alleging that Lakewood, in refusing to bargain with the Union, violated section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1) and (5). Following a hearing the Board ordered Lakewood to bargain with the Union. Lakewood Engineering and Mfg. Co. v. Warehouse, Mail Order, Office, Technical, and Professional Employees Union, Local 743, a/w International Brotherhood of Teamsters, AFL-CIO, 310 N.L.R.B. No. 200 (April 23, 1993). Lakewood appeals.
 
 ISSUES
 
 8
 Lakewood's challenge to the propriety of the Board's order certifying the Union as the employees' exclusive collective bargaining representative centers on two related questions: 1) whether substantial evidence supports the Board's determination that the Union's activities at the Sacramento and Carroll Street polling areas did not coerce or intimidate voters; and 2) whether certification was proper in light of the Union agents' use of cameras in the area of the polling stations.
 
 DISCUSSION
 Standard of Review
 
 9
 In N.L.R.B. v. WFMT, 997 F.2d 269 (7th Cir.1993), we reiterated the standard of review, derived from 29 U.S.C. Sec. 160(e), for considering a petition by the Board for enforcement of an order requiring employers to bargain with certified collective bargaining representatives. We stated that:
 
 
 10
 'The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.' Thus, our 'review of the Board's order is sharply limited.' Livingston Pipe & Tube, Inc. v. NLRB, 987 F.2d 422, 426 (7th Cir.1993). 'We must uphold the Board's determination if its factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in the law.... Substantial evidence in this context means such relevant evidence as a reasonable mind might accept as adequate to support the Board's determination.' Id. (citation omitted). This standard 'does not allow us to dabble in fact-finding and we may not displace reasonable determinations simply because we would have come to a different conclusions if we reviewed the case de novo.' Id. (quoting N.L.R.B. v. P*I*E Nationwide, Inc., 923 F.2d 506, 513 (7th Cir.1991)). We must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life. Id. (citation omitted). We are bound to 'uphold the legal conclusions of the Board unless they are irrational or inconsistent with the National Labor Relations Act.' National Labor Relations Board v. Augusta Bakery. 957 F.2d 1467, 1471 (7th Cir.1992) (citation omitted).
 
 
 11
 WFMT, 997 F.2d at 274. Finally, we note that the results of a Board-supervised representation election are presumptively valid and that the objecting party bears the burden of establishing that the election is invalid. Id. (citing NLRB v. Mattison Machine Works, 365 U.S. 123, 124, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961); N.L.R.B. v. Service American Corp., 841 F.2d 191, 195 (7th Cir.1988)). As the objecting party, Lakewood must demonstrate not only that unlawful acts occurred, but that those acts interfered with the employees' exercise of free choice "to such an extent that they materially affected the results of the election." WFMT, 997 F.2d at 274 (citing N.L.R.B. v. Chicago Tribune Company, 943 F.2d 791, 794 (7th Cir.1991), cert. denied, 112 S.Ct. 2301 (1992)).
 
 A.
 
 12
 Initially, Lakewood contends that the "voters could not exercise free choice in the face of a loud, threatening mob." It complains that "for no apparent reason" the hearing officer rejected their contention that there were fifty employees present at the Carroll Street facility, and it insists that employee Zdzairski was "pelted ... with stones and debris as he made his way to [Canamar's] van." Lakewood states that "[t]he mob action got so out of hand that during the afternoon session, the driveway actually was partially blocked ... resembl[ing] threatening picket-lines which many voters could not avoid on their way to the polls." It argues that "under the Board's view as represented by this case, it is acceptable for violence, threats and assaults to occur directly outside the polling place during the vote so long as the number of victimized voters is small enough." Lakewood argues that this evidence of Union-led intimidation and coercion renders the Board's order unlawful.
 
 
 13
 As we will discuss below, there is some merit to Lakewood's arguments. However, Lakewood's argument that it presented substantial evidence in support of its position that the Union intimidated and coerced voters confuses the issue on appeal, for the question in this forum is not whether substantial evidence supports Lakewood's version of events, but whether substantial evidence supports the Board's determinations. See Chicago Tribune Co., 943 F.2d at 794 ("the party challenging the election has the burden of showing that substantial evidence does not support the Board's decision"). In addition, our standard of review regarding credibility determinations is limited; a hearing officer's determinations of credibility and demeanor "may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its face incredible." Tuf-Flex Glass v. N.L.R.B., 715 F.2d 291, 295 (7th Cir.1983). "If there is evidence to support two conflicting views, the Board's findings must be allowed to stand even though we might have reached a different conclusion on our own." N.L.R.B. v. Champ Corp., 933 F.2d 688, 691 (9th Cir.1990), cert. denied, 112 S.Ct. 416 (1991).
 
 
 14
 In this case witnesses Herrera, Canamar, Stanislawski, and Padilla testified that the number of Union supporters at the Carroll Street facility was approximately fifteen to twenty. While it is true that witnesses Brueck and Kyle testified that there were approximately fifty Union supporters present, it was for the hearing officer to resolve this conflicting evidence. In determining that the number of Union supporters present was fifteen to twenty, the hearing officer noted that "[Galvan's] photographs of the group show somewhere between fifteen and twenty, and while it is certainly possible that some individuals were not in the photograph[s], I do not believe there were as many as fifty as Brueck and Kyle testified." Given the testimony of Herrera, Canamar, Stanislawski, and Padilla, as well as the photographic evidence received, we conclude that the hearing officer's determination as to the number of supporters at the Carroll Street facility is supported by the evidence.
 
 
 15
 With respect to the hearing officer's finding that the Sacramento Street driveway was not blocked, we note that this determination suffers from two defects: 1) it was not responsive to Lakewood's argument that the driveway was partially blocked (whether the driveway was partially or completely obstructed are two separate questions) and 2) it was grounded on a mistaken belief that the testimony of witness Garcia was inconsistent with other witnesses. Garcia testified that the Sacramento Street driveway was partially blocked during one particular time period during the afternoon voting session, whereas witnesses Becara, Cristo, and Padilla testified that the driveway was not blocked during the morning session. The hearing officer failed to differentiate between the two separate and distinct time periods. However, we are cognizant that Garcia's testimony was that a driver had difficulty passing through the Union supporters on the Sacramento Street driveway, and that Garcia testified that she had no knowledge of whether the particular driver was a voting employee. As the party objecting to the presumptively valid election, Lakewood must demonstrate "not only that unlawful acts occurred, but that those acts interfered with the employees' exercise of free choice 'to such an extent that they materially affected the results of the election'." WFMT, 997 F.2d at 274. Because Lakewood failed to meet its burden of producing sufficient probative evidence establishing that the Union supporters' afternoon activities interfered with the employees' exercise of free choice to such an extent that the election's results were materially affected, we conclude that Lakewood is not entitled to have the election set aside.
 
 
 16
 Finally, the hearing officer's finding that Zdzairski was not pelted by stones as he approached Canamar's van is supported by the evidence. We note that the hearing officer stated that "[Zdzairski's] testimony was inconsistent on this point and by his demeanor on the stand he appeared to be enhancing the facts. Furthermore, there was no other testimony to support his assertion that anything was thrown at him." A hearing officer's determinations of credibility and demeanor "may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its face incredible[,]" Tuf-Flex Glass, 715 F.2d at 295, and "[i]f there is evidence to support two conflicting views, the Board's findings must be allowed to stand even though we might have reached a different conclusion on our own." Champ Corp., 933 F.2d at 691. While it is true that one of the Union supporters threw an object at employees Canamar and/or Zdzairski as they were riding inside Canamar's van, (and not at the van itself, as found by the hearing officer), we note that 1) Zdzairski had already voted (and thus could not have had his vote affected by the incident) and 2) Lakewood failed to present any witnesses who had not yet voted, observed the stone-throwing, and were intimidated thereby. Therefore, we are not convinced based on the record before us that this incident interfered with the employees' exercise of free choice to such an extent that the results of the election were materially affected. See WFMT, 997 F.2d at 274. We hold the hearing officer's factual findings with respect to the size of rally, whether the driveway was partially blocked, and the throwing incident meet the requisite standard of proof (substantial evidence). 29 U.S.C. Sec. 160(e).
 
 B.
 
 17
 We next address Jose Galvan's and Rico Cristo's use of cameras during the Carroll and Sacramento Street rallies and the Union's dubious explanations regarding the picture taking. Lakewood contends that the use of the cameras "created an atmosphere of surveillance, coercion, intimidation, and reprisal, all of which rendered free choice impossible." The employer notes that when interrogated at the scene while taking the actual pictures, the Union representatives failed to offer any explanation as to why they were taking photographs. Secondly, Lakewood characterizes the Union's explanation of the accidental exposure of the Sacramento Street pictures as "wholly implausible."
 
 
 18
 Both the courts and the Board, through the application of logic and the experiences of life, have recognized the coercive and intimidating effect Union photography may have on employees during an election. See, e.g., Millard Processing Services, Inc. v. N.L.R.B., 2 F.3d 258 (8th Cir.1993), cert. denied, 114 S.Ct. 922 (1994); Air Line Pilots Ass'n v. United Air Lines, Inc., 802 F.2d 886 (7th Cir.1986); N.L.R.B. v. Associated Naval Architecture, Inc., 355 F.2d 788 (4th Cir.1966); Nu-Skin International, Inc., 307 NLRB 223 (1992); Mike Yurosek & Sons, Inc., 292 NLRB 1074 (1989); and Pepsi Cola Bottling Co. of Los Angeles, 289 NLRB 736 (1988). In this factual scenario, the subjects of photography had no knowledge of why the Union was taking their pictures at that particular time. In the absence of a timely and plausible explanation for this intrusion with cameras, or perhaps even with an explanation, it is not unreasonable for a photographed voter to be intimidated and to be fearful and apprehensive of future Union retribution.
 
 
 19
 Cristo and Galvan testified some five weeks after the actual event that they were instructed by the Union to take photographs of Union supporters during the rallies for use in the Union newsletter. There is no such evidence in this record that Cristo and Galvan offered any explanation for their actions to the subjects of their pictures contemporaneous with the taking of the pictures. The only pictures introduced into evidence depict Union supporters waving banners and placards, and it is true that some of these photographs appeared in the April 1992 Union newsletter. In spite of the fact that Galvan and Cristo gave no explanation to the subjects of their photographs contemporaneous with taking their pictures, the hearing officer stated that publication in the Union newsletter was a "valid explanation for taking the photographs" and concluded that "I do not believe that the use of the camera at the Sacramento and Carroll Street facility to take photographs of [Union] supporters constitutes objectionable conduct." Citing its Decision and Order in Nu-Skin, the Board agreed with the hearing officer's conclusion that the photographs of employees voluntarily attending a Union rally were not objectionable. With regard to the photograph of the two employees observing the Union rally from a darkened tool room, the Board determined that "[that] single photo ... was an isolated event that does not warrant setting aside the election."
 
 
 20
 In Nu-Skin, upon which the Board relied, Union representatives took some eighty-eight photographs of employees attending the Union's picnic luncheon. Many of the photographs depicted employees posing for the camera and sometimes displaying Union T-shirts, and "were for the purpose of memorializing the chicken meal and perhaps to publish in a union newspaper." 307 NLRB at 224. Although two employees testified that they were "concerned" and "felt funny" about having their picture taken, the Board affirmed the hearing officer's conclusion that "the photographs were innocuous and that the Union's taking of them did not reasonably tend to interfere with the employees' free and uncoerced choice in the election." Id. The Nu-Skin Board also noted that when asked why the pictures were being taken, the Union representative stated, "You all are going to make the front page of USA Today," and "we want you to remember this fun-filled memory." Id. at 224-25.
 
 
 21
 The Board in Nu-Skin found the circumstances in that case "entirely distinguishable" from the two cases Lakewood relies upon, Pepsi Cola and Mike Yurosek. The Nu-Skin Board noted that in Pepsi Cola, on the day before the election and while a union rally was in progress, a union representative appeared to videotape at least two employees as they exited the workplace and were handed union leaflets, and that "[n]o explanation for the videotaping was offered then or at the hearing." Nu-Skin, 307 NLRB at 224. The Board concluded that, in the absence of explanation from the union, the employees could reasonably believe that the union was contemplating future reprisals against them."
 
 
 22
 In Mike Yurosek, a union representative took photographs of pro-union and anti-union employees' campaign activities at the employer's entrance gate almost every day during an election campaign. The union representative told an anti-union activist that "We've got it on film; we know who you guys are ... after the union wins the election some of you may not be here." Mike Yurosek, 292 NLRB at 1074. "Finding the photographing objectionable, the Board noted that no explanation of the photographing was provided to assuage the employees' fears and that the union representative's statement was arguably threatening. The Board also noted that no valid explanation of the photographing was offered at the hearing." Nu-Skin, 307 NLRB at 224.
 
 
 23
 In the case at bar, the hearing officer made credibility determinations which are somewhat questionable when considering the surrounding facts and circumstances but which we are bound to accept under our restrictive standard of review, even though we may have come to different conclusions if we had reviewed the record de novo. WFMT, 997 F.2d at 274; see also Tuf-Flex Glass, 715 F.2d at 295 (hearing officer's determinations of credibility and demeanor "may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its face incredible"). The hearing officer concluded that the subjects of the photographs were all Union supporters attending a rally and the pictures were taken for the purpose of publication in the Union's newsletter. Allegedly the sole exception was the single photograph of the two employees in the darkened tool room. In Nu-Skin the Board rejected the employer's contention that the picture-taking intimidated the employees even though two of the employees testified that they were "concerned" and "felt funny" about being photographed. Here, the record reveals that Lakewood failed to produce any eyewitnesses to testify that he or she was concerned or made to feel uncomfortable by the Union's picture-taking. The two employees who were photographed in the tool room testified and neither stated that he felt threatened from the photography.
 
 
 24
 However, it is troubling that in this case the Union failed to offer an explanation for the photography at the time the pictures were being snapped. It was not until five weeks after the election--allowing the Union plenty of time to come up with a justification for its actions--that the Union stated that the photos were for publication in the Union newsletter. In Pepsi Cola and Mike Yurosek, the Board observed that the Union failed to offer a valid explanation of why it was taking photographs either at the time the pictures were taken or at the hearing afterward. Nevertheless, as we noted in NLRB v. Precise Castings, Inc., 915 F.2d 1160, 1164 (7th Cir.1990), cert. denied, 499 U.S. 959 (1991), "[r]erunning elections, or litigating about their validity, may frustrate indefinitely the implementation of the employees' legitimate selection. Choosing how much imperfection to accept is for the Board." Although we affirm the Board's conclusion that under the circumstances it would be inappropriate to set aside the election, we wish to make it clear that photography that intimidates, coerces, or influences voters in labor elections will not be tolerated.
 
 
 25
 Finally, Lakewood argues that it is "wholly implausible" that the pictures taken at the Sacramento Street rally were inadvertently destroyed. The hearing officer based his factual finding that the exposure of the film was accidental "base[d] ... on my observation of the demeanor of Galvan and Cristo while testifying and the fact that the [Union] had no hesitancy to introduce into evidence the [pictures available on that date] it took at the Carroll Street facility the evening of April 3 and the admission that Cristo was taking photographs at 601 N. Sacramento that morning." Although we believe there is some merit to Lakewood's implausibility characterization, we note that our restrictive standard of review bars us from reweighing credibility determinations. WFMT, 997 F.2d at 274.
 
 CONCLUSION
 
 26
 The hearing officer's findings of fact with respect to the number of Union supporters at the Carroll Street facility and the stone throwing incident, subsequently adopted by the Board, are supported by substantial evidence in the record considered as a whole. With regard to the partial blocking of the Sacramento Street driveway and the Union's photography, we conclude that the Board's determination that the Union did not engage in conduct sufficient to warrant a new election was proper. Therefore, the Board's Decision and Order requiring Lakewood to bargain with the Union is ENFORCED.
 
 
 
 *
 Honorable James B. Moran, Chief Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The employees who voted were "[a]ll full-time production, maintenance, tool room and warehouse employees employed at the Employer's facilities now located at 1901-45 W. Carroll Street, 1756 W. Lake St., 501 N. Sacramento St., 212 N. Carpenter St., and 315 N. Racine, Chicago, Illinois[.]"
 
 
 [2]
 Thus, there were two Union photographers (Galvan and Cristo) taking pictures at two different sites (Carroll Street and Sacramento Street). Galvan's pictures of the Carroll Street activities were admitted into evidence at the hearing. However, Cristo's pictures (of the Sacramento Street activities) were not introduced into evidence because Cristo's film according to the Union was allegedly exposed to light and supposedly destroyed. At the hearing, Lakewood argued that the Union or Cristo purposely destroyed the film, but the hearing officer found that the film was ruined "inadvertently[.] ... I base this finding on my observation of the demeanor of Galvan and Cristo while testifying and the fact that the [Union] had no hesitancy to introduce into evidence the photographs it took at the Carroll Street facility the evening of April 3 and the admission that Cristo was taking photographs at 601 N. Sacramento that morning."