**LIVINGSTON PIPE & TUBE, INCORPORATED,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LIVINGSTON PIPE & TUBE, INCORPORATED,**
Respondent.

Nos. 91–2939, 91–3152.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1992.

Decided March 2, 1993.

Rick Verticchio (argued), Phelps, Kasten, Verticchio & Ruyle, Gillespie, IL, for Livingston Pipe & Tube Inc.

Charles P. Donnelly, Jr., Richard A. Cohen (argued), Marion L. Griffin, Contempt Litigation Branch, Aileen A. Armstrong, Appellate Court, Enforcement Litigation, Washington, DC, Joseph H. Solien, Kathie M. Grampp, N.L.R.B., St. Louis, MO, for N.L.R.B.

Before COFFEY and FLAUM, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

COFFEY, Circuit Judge.

On July 24, 1991, the National Labor Relations Board ("the Board") found that Livingston Pipe & Tube, Inc. ("the Company") committed several unfair labor practices as defined by the National Labor Relations Act, 29 U.S.C. §§ 151–169 ("the Act"). *Livingston v. Local 483*, 303 N.L.R.B. No. 125, 1991 WL 148190 (N.L.R.B. July 24, 1991). The Company petitioned for review of the Board's Decision and Order ("the Order"), and the Board filed a cross-application seeking enforcement of the Order. We have jurisdiction to hear this appeal under 29 U.S.C. §§ 160(e) and (f). We grant the Board's cross-application for enforcement.

## I. Factual Background

The Company processes, for non-retail sale, pipe and other related steel products at two locations in and near Staunton, Illinois. At all times relevant to this dispute, Mike Favre was the Company's owner and president; Bill Dittmar was operations manager; and Gary Buske and Stanley Pirok served as foremen. The Company's two facilities were manned by a total of 14 to 18 employees.

On March 25, 1988, Company employees met with a representative of Local 483 of the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO ("the Union"). At a March 30 meeting, several Company employees signed Union authorization cards [1] and were given Union buttons and stickers to wear and display at work. Alberic R. Vancauwelaert was one of the employees involved in these early organizational efforts.

On March 31, the Union filed a petition with the Board seeking a representation election, and the election was set for May 20, 1988. The next day, foreman Pirok questioned Vancauwelaert, who was wearing a Union badge, about why the employees were attempting to unionize and why they had not conferred with Company President Favre before launching their organizational drive. Vancauwelaert responded that he thought the Union "would better our environment at" the Company and that "Mike Favre would have fired us all for complaining." Around that same time, Pirok asked employee Michael L. Jarman why he was wearing a Union button and whether he supported the Union. Jarman replied that he supported the Union drive. Pirok then told Jarman that "the union wasn't worth it." Later in April, Pirok questioned Jarman about his presence at a Union organizing meeting in Mount Olive, Illinois.

On May 6, 1988, Company President Favre held a meeting with all Company employees and urged them not to support the Union organizing effort. After the meeting, Favre approached employee Jeffrey Hausman and told him that the union would do nothing "but cost you union dues every month." Favre also asked Hausman

---

1. These cards express the employee's desire that the union represent him.

if he enjoyed attending "ball games." When Hausman answered yes, Favre said, "let me know in advance sometime and I will get you some tickets for you and your wife to go see a ball game."

On May 10, 1988, Pirok approached employee Darrell L. Hoffstot and asked him how he was planning to vote in the upcoming Union election. Hoffstot testified that he replied, "[w]here's my ball tickets? I was referring to baseball tickets. He [Pirok] said, is that all it will take? I said, well, that is a start. He said he would work on it." On May 13, Favre met with Hoffstot and told him that a union was not necessary because in "six or seven months ... all these people would be working for me [Hoffstot]." Favre also told Hoffstot that it was not "too late" for the employees to halt their unionization drive. On May 18, Pirok approached employee Daniel W. Sexton and attempted to persuade him not to support the union effort.

On May 20, a majority of the Company employees voted to join the Union.[2] On June 21, operations manager Dittmar handed employee Jarman a letter informing him that he was discharged for excessive absenteeism and tardiness. The stated reason was that Jarman had been absent from work the day before. Jarman had been absent from work nine times in the previous ten months and had never been disciplined nor warned for excessive absenteeism. In 1987, Jarman had been suspended for two work days after failing to report for optional Saturday overtime work after volunteering for the work.

On July 15, employee Vancauwelaert telephoned his supervisor Buske to tell him that he was going to be absent that day. On July 18, Pirok handed Vancauwelaert a memorandum informing him that he was being suspended for two work days for excessive absenteeism. The memorandum also warned that the "next unexcused absence, or any evidence of [a] pattern [of]

absences, excused or unexcused, will result in the termination of your employment from Livingston Pipe." Vancauwelaert had been absent 15½ days during his one year with the Company, but had never been informed that his record was unacceptable. On September 19, Vancauwelaert called the Company yard to inform Buske that he could not report that day because his wife was ill and "I needed to have her looked at and I [don't] want to leave her by herself." At around 4 p.m., Vancauwelaert arrived at the Company yard to pick up his check. Pirok handed him a letter informing him that he was terminated for being "in violation of an absenteeism code." The letter referred to prior warnings about absenteeism and to Vancauwelaert's July suspension.

On September 29, employee Hausman reported for work 45 minutes late. Later in the day, he was given a memorandum from Pirok informing him that he was suspended from work for 30 days. The memorandum stated that Hausman had been suspended for two days in 1987 for failing to report for Saturday overtime work after volunteering for the work. The memorandum also noted that Hausman had been absent from work 5½ days during 1988 and had been tardy twice.

Sexton was one of the Company's most senior employees with 6½ years of service. In late 1986 or early 1987, Sexton had an accident while operating a forklift that caused $2,000 in damages to the machine. No action was taken against him following that incident. On May 23, 1988, 3 days after serving as the Union's observer at the election, Sexton accidently bumped his forklift against a "scrap tub", resulting in $25 in damage and delaying operations at the yard for 90 minutes. He was warned by operations manager Dittmar to be more careful. On May 24, Sexton was handed a letter signed by Dittmar which warned that "any further acts of carelessness/reckless-

2. The Company challenged the validity of the election by filing an objection with the Board's Regional Director in Chicago. On June 15, 1988, the Regional Director issued a report recommending that the Company's objections be overruled and the Union be certified as the exclusive bargaining representative of the Company's employees. The Company sought a review of the Regional Director's report. The Board denied the Company's request for review, and certified the Union as the employees' bargaining representative on February 23, 1990.

ness will result in significant discipline, up to and including termination, depending upon the seriousness of the incident." Five months later, on October 27, Sexton was steering his loaded forklift in rainy conditions down an incline through a warehouse door. Sexton's undisputed testimony was that the forklift brakes failed, and the machine skidded into the right side of the doorway frame, pushing it slightly out of alignment. The warehouse was already in a dilapidated condition and, with no supervisors on site, Sexton did not report the incident. Three workdays later, on November 2, Buske asked Sexton about the incident and why he had not reported it to him either the day it happened or the following day. Sexton replied that Buske was "nowhere to be found" when the accident occurred and that the following day, "I didn't see you much...." Later that day, Pirok handed Sexton a letter stating that he was terminated for his "irresponsible behavior" in the forklift accident and his failure to report the accident. Sexton complained that the accident was caused by brake failure and that he had reported the problem to the Company mechanic who was "dumping brake fluid in them about every other day and the brakes just wouldn't hold 100 percent." Pirok indicated that the termination would not be reconsidered.

## II. Board Decision and Order

The Union charged the Company with numerous violations of the Act. The Board, upholding the decision of an administrative law judge, found that the Company had coercively interrogated employees about their union sympathies, promised them benefits during a union campaign, implied that selection of a union would be futile, created the impression that the employees' union activities were under surveillance, and attempted to induce an employee to solicit his co-workers to withdraw their signed union authorization cards. The Board found that all these actions were in violation of Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), which makes it an unfair labor practice "for an employer to interfere with, restrain, or coerce employees in the exercise of" their Section 7, 29 U.S.C. § 157, rights to "self-organization, to form, join, or assist labor organizations...." The Board also found that the Company violated Sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1), by discharging three employees and suspending a fourth in retaliation for their union activities. Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Finally, the Board found that the Company violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1), by refusing to bargain with the Union and by unilaterally implementing a new absenteeism and tardiness policy without notice to or bargaining with the Union. Section 8(a)(5) makes it an unlawful labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...."

The Board ordered the Company to cease and desist from engaging in the unfair labor practices found, and from "[i]n any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act." The Board Order also required the Company to reinstate discharged employees Jarman, Sexton and Vancauwelaert to their former jobs and make them, as well as employee Hausman, whole for any loss of earnings and other benefits suffered as a result of the discrimination against them. The Board also ordered the Company to rescind the unilaterally imposed absenteeism and tardiness policy.

In its petition for review to this Court, the Company challenges only the Board's findings of unfair labor practices as to its discharge of Jarman, Sexton and Vancauwelaert and its suspension of Hausman, and in its unilateral implementation of the absenteeism and tardiness policy after the Union's election victory. The Company does not challenge the Board's finding that it committed unfair labor practices in its efforts to thwart the Union election campaign, and therefore this part of the

Board's Order is summarily affirmed. *National Labor Relations Board v. P\*I\*E\* Nationwide, Inc.,* 923 F.2d 506, 514 n. 9 (7th Cir.1991).

### III.  Standard of Review

Our review of the Board's Order is sharply limited. "We must uphold the Board's determination if its factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in the law." *National Labor Relations Board v. Augusta Bakery Corporation,* 957 F.2d 1467, 1471 (7th Cir.1992). "Substantial evidence in this context means such relevant evidence as a reasonable mind might accept as adequate to support the Board's determination." *Id.* (citation omitted). This standard "does not allow us to dabble in factfinding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case *de novo.*" *Id.* (quoting *P\*I\*E,* 923 F.2d at 513). "We must recognize the Board's special function of applying the general provisions of the ... Act to the complexities of industrial life". *Kankakee–Iroquois County Employers' Association v. National Labor Relations Board,* 825 F.2d 1091, 1093 (7th Cir.1987) (citation omitted). Moreover, we are bound to "uphold the legal conclusions of the Board unless they are irrational or inconsistent with the National Labor Relations Act." *Augusta Bakery,* 957 F.2d at 1471 (citation omitted). "We may not, as a reviewing court, displace the Board's choice between fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." *National Labor Relations Board v. Bliss and Laughlin Steel Co.,* 754 F.2d 229, 234 (7th Cir.1985) (citation omitted).

### IV.  Discussion

With this deferential standard of review in mind, we now address the Company's two challenges to the Board's Order.

### A.

The Company's first contention is that substantial evidence does not support the Board's determination that the Company violated Sections 8(a)(3) and (1) of the Act by discharging employees Jarman, Sexton, and Vancauwelaert, and suspending employee Hausman, in retaliation for their pro-Union activities. The Company denies that it was motivated by anti-union animus when it acted against these employees.

■ "The Board's General Counsel bears the burden of proof, by a preponderance of the evidence, that the discharge or other interference with protected activity was based in whole or in part on antiunion animus or [that the antiunion animus] was a substantial motivating factor in the adverse action." *J. Huizinga Cartage Co. v. National Labor Relations Board,* 941 F.2d 616, 620 (7th Cir.1991) (citation omitted); *see also Bliss and Laughlin Steel Co.,* 754 F.2d at 234. The Board may properly look to circumstantial evidence in determining whether the dismissals and suspension were illegally motivated. *National Labor Relations Board v. O'Hare–Midway Limousine Service, Inc.,* 924 F.2d 692, 697 (7th Cir.1991). Whether the dismissals and suspensions closely followed the commission of other unfair labor practices by the Company and "other evidence regarding the Company's antiunion animus" are also relevant in deciding whether the Company acted with an illegal motive. *Id.* "Once the general counsel establishes that the employer was motivated by antiunion sentiment, the employer will be held in violation of the Act unless it can show that the same decisions would have been made absent the employee's protected activity." *Huizinga,* 941 F.2d at 620.

■ The record contains substantial evidence supporting the Board's conclusion that the employees' pro-union stance was a "motivating factor" in the Company's discharge of Jarman, Sexton and Vancauwelaert, as well as its suspension of Hausman. As we discussed above, a vigorous union organizing campaign was launched by the Company's employees in March, 1988, and a union election was scheduled for May 20.

Vancauwelaert, Hausman and Jarman attended union organizing meetings. Vancauwelaert solicited signatures on cards authorizing the Union to act as the employees' exclusive representative. Hausman, Jarman and Vancauwelaert signed these authorization cards, and wore buttons proclaiming their support for the Union both before and after the Union's election victory. Sexton also attended Union meetings and he served as the Union's observer at the election. All four of the employees had been targets of the Company's coercive pre-election efforts to blunt the Union organizing drive, efforts which the Board found violative of Section 8(a)(1) of the Act, a determination the Company does not challenge in its petition for review. Each of the employees had been approached by foreman Pirok and, in several cases, by Company President Favre, and coercively interrogated about their Union support. The Company officials attempted, through promises of benefits and through thinly veiled warnings of the futility and risks of the Union effort, to dissuade the employees' from continuing with their organizing campaign. All four employees continued to wear their Union buttons at work through the day of the election.

A month and a day after the Union's victory in the May 20 election, Jarman was discharged for excessive absenteeism. Shortly afterwards, Pirok warned Vancauwelaert and Hausman about their absenteeism and tardiness records. Three months later, on September 19, Vancauwelaert was fired for violating a non-existent "absenteeism code." Ten days later, Hausman was suspended for similar reasons. Less than two months later, Sexton was terminated after a minor accident involving his forklift.

The record clearly demonstrates that all four of these employees were the targets of the Company's illegal pre-election effort to stop the Union organizing drive. The discharges and suspension closely followed the Union's election victory and occurred while the Company continued to refuse to negotiate with the Union. Given these circumstances, we are convinced that substantial evidence supports the Board's conclu-sion that the Board's General Counsel met its burden to establish by a preponderance of the evidence that the Company's anti-union animus was a motivating factor in the actions taken against these employees.

"Although the General Counsel has established antiunion animus, the Company may avoid a finding that it committed an unfair labor practice by proving that the discharges [and suspension] would have occurred regardless of [its] forbidden motivation." *Huizinga,* 941 F.2d at 621 (quoting *National Labor Relations Board v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983)). The Company claims that it fired Jarman and Vancauwelaert, and suspended Hausman, because they violated an established policy regarding absenteeism and tardiness. We agree with the Board that this claim is incredible. The Company had no written policy as to how often an employee could be tardy or absent before being subject to discipline. New employees were simply instructed to give as much advance notice as possible of any absences. Company foreman Pirok admitted that the point at which tardiness and absenteeism become excessive was a subjective determination that he alone made. The Company provided no evidence that any other employee besides Jarman, Vancauwelaert and Hausman were *ever* disciplined for excessive tardiness or absenteeism. Against this backdrop, the sudden flurry of warnings, suspensions and discharges following the Union victory appears quite suspect. Thus, we refuse to upset the Board's determination that the Company failed to prove by a preponderance of the evidence that Jarman, Vancauwelaert and Hausman would have been discharged or suspended absent their pro-Union activities.

We are likewise unconvinced by the Company's claim that Sexton would have been discharged even if he had not been a Union supporter. The Company insists that it fired Sexton because the forklift he was driving damaged a warehouse door on October 27, 1988. As the Board found, the Company "seized on a minor incident occur-

ring October 27, 1988 (namely the slight denting with a forklift of a doorframe to a dilapidated warehouse) to rid itself of employee ... Sexton, a Union adherent." The May 24 notice given to Sexton after a forklift accident which shut down operations for 90 minutes warned him that he would be subject to "significant discipline up to and including termination, *depending on the seriousness of the incident.*" (emphasis added). Sexton's undisputed testimony established that the October 27 accident occurred because the forklift brakes failed. He informed his supervisors that the brakes were at fault, but they refused to reconsider the discharge. We agree with the Board that this lack of interest in the true cause of the accident and the nearly-negligible damage to the doorframe of an already dilapidated warehouse are substantial evidence that the Company was merely seizing on the accident as a pretext to fire Sexton in retaliation for his Union support.

We also conclude that the substantial evidence supports the Board's rejection of the Company's claim that Sexton was fired as much for the failing to report the October 27th accident immediately after it happened as for the accident itself. The Board relied on Sexton's testimony, again undisputed, that no supervisors were present when the accident occurred. Sexton quite credibly testified that he viewed the bump to the already dilapidated warehouse as so minor that he neglected to report it the following day. While we do not condone Sexton's failure to report the forklift accident to his supervisors, we are convinced this employee, one of the Company's most senior with 6½ years of service, was not discharged for this minor infraction. Substantial evidence supports the Board's finding that Sexton would not have been discharged absent his pro-Union activities.

### B.

■ We now address the Company's second challenge to the Board's Order. The Board found that the Company violated Sections 8(a)(5) and (1) of the Act by refusing to bargain with the Union after its election victory and by unilaterally implementing a new absenteeism and tardiness policy. The Company concedes that it refused to bargain with the Union until it was certified by the Board on February 23, 1990. "If the Board rejects the objections [of an employer] and certifies the Union, the employer's duty to bargain relates back to the date of the election...." *Advertisers Manufacturing Company v. National Labor Relations Board,* 677 F.2d 544, 547 (7th Cir.1982). Therefore, the Board correctly determined that the Company committed an unfair labor practice by refusing to bargain with the Union. The Company denies that it unilaterally implemented a change in the terms and conditions of employment without bargaining with the Union. "[A]bsent compelling economic reasons, an employer who unilaterally changes terms and conditions of employment during the pendency of objections [to the Union's representative status] may be charged with a section 8(a)(5) violation once the union is certified." *National Labor Relations Board v. 1199, National Union of Hospital and Health Care Employees, AFL–CIO,* 824 F.2d 318, 320 (4th Cir.1987); *see also National Labor Relations Board v. Parents and Friends of the Specialized Living Center,* 879 F.2d 1442, 1455 (7th Cir.1989). "[A]n employer who makes unilateral changes pending a decision on union certification objections acts at its peril." *Parents and Friends,* 879 F.2d at 1455. "The purpose of [this] rule is to prevent employers from postponing their bargaining obligation through dilatory tactics and spurious objections." *1199, National Union,* 824 F.2d at 320.

■ The Company makes one argument in support of its claim that the Board erred in finding that the Company committed an 8(a)(5) violation by unilaterally implementing a tardiness and absenteeism policy after the Union's victory. The Company maintains that this policy was in existence long before the Union's victory and that the discharges of Jarman and Vancauwelaert and the suspension of Hausman were in accordance with this established policy. As we noted above, substantial evidence supports the Board's finding that the treatment of the three employees represented a

sharp break with past practices. No written policy existed, nor was there any specific limit on how many absences or episodes of tardiness were allowed before discipline or discharge would result. The Company offered no evidence that it had *ever* informed *any* employee about the existence of an absenteeism or tardiness policy until it gave Jarman his termination notice shortly after the Union prevailed in the election. In fact, Pirok admitted that new employees were simply told to give as much advance notice as possible of any absences or tardiness. The Company had not disciplined or terminated any employee for violation of the alleged "policy" until it moved against Jarman, except in two instances in which brief suspensions were imposed on employees who failed to report after volunteering for Saturday overtime work and failed to phone in their absence. At most, these two suspensions establish that the Company's only "policy" (before the Union election victory) was that employees were required to give notice when they expected to be absent. The Company's discharge of Jarman and Vancauwelaert and its suspension of Hausman thus represented the unilateral implementation of a new term or condition of employment in violation of Section 8(a)(5) of the Act.

### V.  Conclusion

The Board's findings that the Company committed unfair labor practices by discharging Jarman, Vancauwelaert and Sexton, and suspending Hausman, and by unilaterally implementing a new absenteeism and tardiness policy after the Union election victory are supported by substantial record evidence. Accordingly, we DENY the Company's petition for review and GRANT the Board's application for ENFORCEMENT of its Order.