**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Q–1 MOTOR EXPRESS, INCORPORATED, Respondent.**

No. 93–1746.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1993.

Decided May 25, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 29, 1994.

Elizabeth Kinney, N.L.R.B., Region 13, Chicago, IL, Aileen A. Armstrong, William A. Baudler (argued), N.L.R.B. Appellate Court, Enforcement Litigation, Washington, DC, Paul J. Spielberg, N.L.R.B., Litigation Branch, Washington, DC, D. Randall Frye, N.L.R.B., Region 9, Cincinnati, OH, for petitioner.

Douglas C. Haney (argued), James H. Hanson, Scopelitis, Garvin, Light & Hanson, Indianapolis, IN, for respondent.

Before LAY,* COFFEY and ROVNER, Circuit Judges.

LAY, Circuit Judge.

The National Labor Relations Board (the "Board") seeks enforcement of its order finding Q–1 Motor Express, Inc. ("Q–1" or the "Company"), guilty of unfair labor practices.[1] The Board held, in accordance with the findings of an Administrative Law Judge ("ALJ"), that the Company had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1988) ("the Act"), by threatening employees with closure of its terminal, job losses, and other reprisals if they became unionized; by creating the impression of surveillance of union activities; and by granting the employees pay increases and promising to address their grievances in order to discourage union activities. The Board also affirmed the ALJ's findings that Q–1 had violated sections 8(a)(1) and 8(a)(3)

of the Act, 29 U.S.C. §§ 158(a)(1), (3) (1988), by discharging three pro-union employees, drivers Donald Denham, Dan Stevens, and Anthony Lupo, because of their union activities. The Board found that the General Drivers, Warehousemen & Helpers Local Union No. 89, affiliated with the International Brotherhood of Teamsters, AFL–CIO ("the Union"), represented a majority of the Company's employees in an appropriate bargaining unit as of May 19, 1991, an appropriate date for examining section 8(a)(1) and 8(a)(3) violations, and determined that the Company's violations were so pervasive as to make a fair election unlikely. The Board held that a bargaining order was therefore appropriate. It ordered the Company to reinstate Denham, Stevens, and Lupo and to bargain in good faith with the Union upon request. This enforcement action, and the Company's cross-petition for review, followed.

Upon careful review of the record, we find substantial evidence supporting the Board's section 8(a)(1) and 8(a)(3) determinations.[2] We further find no abuse of discretion in the Board's determination that a bargaining order is appropriate to remedy the violations at Q–1. We therefore enforce the Board's order.

## I. BACKGROUND

In early May, 1991, Q–1 driver Donald Denham contacted the Union about organizing the Company's employees. Denham obtained union authorization cards and with the help of other employees began soliciting card signatures.

The Company became aware of the organizing campaign shortly after it began, and it responded with hostility. As found by the ALJ, about a week after part-time driver Anthony Lupo signed an authorization card,

---

* The Honorable Donald P. Lay, Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Q–1 Motor Express, Inc., an Indiana Corporation, had at all times relevant its principal office and terminal in Clarksville, Indiana. It is engaged in interstate trucking.

2. Our review of a Board order is confined to assessing only whether the Board's "'factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in the law.'" *Livingston Pipe & Tube, Inc. v. NLRB*, 987 F.2d 422, 426 (7th Cir.1993) (quoting *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1471 (7th Cir.1992)).

a Q–1 supervisor told him that Company management knew that union cards were being distributed and that if he knew what was good for him, he would stay away from those involved in the effort. Another driver who had signed an authorization card was told by this same supervisor, whose husband was a Q–1 driver, that she hoped her own husband would not join the Union. If he did, the supervisor explained, he would have to find another job, because "Q–1 could not stand union pressure."

A short time later, on May 17, Q–1 President James E. Schroering confronted organizer Denham at a truck stop, telling him, in a conversation that was overheard in part by driver Lupo, that he knew that Denham was the one passing out the union cards. Schroering told Denham that he had spoken with his attorney and had been advised that to thwart the Union, he could fire all the drivers, close the Company down, and then reopen with new drivers 72 hours later. Denham testified that Schroering said he would not permit "no half-ass Union [to] come in and try to tell him how to run his business." Schroering also informed Denham that he had called Denham's previous employer and learned that Denham had been a member of the Teamsters Union for ten years. Finally, Schroering told Denham that he knew that the drivers were planning a meeting for May 19, and that he was going to hold a meeting with the drivers that same day.

On May 19, the day of the employees' organizational meeting, Q–1 ran, for the first time, a newspaper advertisement for new drivers. At the meeting, the employees discussed the advertisement and wondered why the Company was seeking more drivers when it had for months refused to put part-time driver Lupo on full-time status. The drivers also discussed the Company's failure to raise their compensation rates, a major impetus for the organizing campaign. Denham informed the employees who had gathered that he had received authorization cards from a majority of the drivers and that he had told the Union that they had elected it as their bargaining representative.

Later that afternoon, the Company began its own meeting with the employees. Q–1 Vice President James J. Schroering began the meeting by complaining about unions and stating that he knew that "little green [union] cards" were being circulated among the employees. President James E. Schroering then announced that the Company was increasing the compensation rates for the drivers, purportedly because of the improved gas mileage the drivers had been able to attain. He also invited the employees to express their job concerns and agreed to give Lupo more hours in exchange for a reduction in the hours driven by the other drivers.

After the Company meeting, Denham and some of the other Union supporters met to discuss the status of the organizing campaign. Driver Dan Stevens, who had filled out his union card at the earlier meeting but forgotten to sign it, asked Denham to turn his card in along with the others. Denham and Lupo then arranged for Lupo to deliver the cards to the Union. The ALJ determined that as of May 19, 1991, eight authorization cards had been executed, enough to constitute a majority of the bargaining unit's eleven employees.

On Friday, May 24, President James E. Schroering complained to Stevens that he thought he "had better friends in this Company amongst the drivers than what's turned out to be." He told Stevens, "I know everybody that signed a Union card. [I]f it takes firing everybody to keep the Union out of here, then that's what I will do." Shortly thereafter, three union supporters, including Denham, Stevens, and Lupo, were fired.

Q–1 asserts that each of the employees was fired in accordance with Q–1's disciplinary procedures, for work-related transgressions. The ALJ thoroughly examined and rejected each of the Company's proffered explanations and concluded that the three drivers had been discharged because of their union membership and activities.

On July 18, 1991, the Union wrote to the Company to demand recognition. The Company failed to reply. The Union also filed a charge with the Board accusing Q–1 of unlawfully attempting to discourage employee

support for the Union and requesting that, in view of Q–1's unlawful conduct, the Board issue a bargaining order.[3]

## II. DISCUSSION

### A. *Unfair Labor Practices*

#### 1. *Section 8(a)(1) Violations*

On the basis of the testimony credited by the ALJ, the record fully supports the Board's findings of unfair labor practices. Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §§ 157, 158(a)(1) (1988); *see NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 819 (7th Cir.1991). The test for what constitutes "interference" with these rights is not whether an attempt at coercion succeeded or failed, but whether the employer engaged in conduct that " 'reasonably tends to interfere with, restrain, or coerce employees in the free exercise' " of their protected rights. *Id.* at 819 n. 5 (citation omitted); *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 689 (7th Cir.1982).

The record before us is replete with instances of comments and conduct that would reasonably tend to interfere with the employees' right to self-organization. As we noted in *Central Transport v. NLRB*, 997 F.2d 1180 (7th Cir.1993), "Threatening employees with shop closure or discharge, or coercively interrogating them to discourage union activities violates Section 8(a)(1) of the Act," *id.* at 1189. Here, Q–1 management personnel repeatedly threatened drivers that Q–1 would shut down and reopen with new employees rather than allow the drivers to unionize. Moreover, Q–1 President James E. Schroering interrogated drivers (and in one case, a driver's spouse) about the union organization efforts and made explicit and implicit threats of retaliation. *See Berger*, 678 F.2d at 689 (observing that "when the questions asked 'viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities,' a violation has been established" (citation omitted)). Through such coercive interrogations and numerous other statements, Q–1 created an impression that it was engaging in surveillance of the union activities, another impermissible labor practice under section 8(a)(1). *See id.* at 691.

**3.** On October 2, 1991, the General Counsel for the Board petitioned for temporary injunctive relief against Q–1 under section 10(j) of the Act, pending final disposition of the amended complaint. The 10(j) proceeding concerned the same alleged 8(a)(1), (3), and (5) violations included in this action. The General Counsel sought reinstatement of Denham, Stevens, and Lupo and a bargaining order requiring Q–1 to recognize and bargain with the Union as the employees' exclusive bargaining agent. On December 27, Judge Sarah Barker of the United States District Court for the Southern District of Indiana denied the General Counsel's requested relief. At the later hearing on merits, the Board denied the Company's request to reopen the record in this case to include the transcript of the 10(j) proceeding.

On appeal, Q–1 places emphasis upon Judge Barker's credibility findings (which seemingly contradict the ALJ's findings in this proceeding). We have not studied the 10(j) proceeding. The transcript is not part of the record before us. However, and more importantly, the law is clear that "findings made on a motion for temporary injunction under section 10(j) are not determina-

tive of the merits in a subsequent unfair labor practice proceeding, and that review of the latter is limited by the substantial evidence rule." *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 957 (2d Cir.1988); *accord NLRB v. Acker Indus., Inc.*, 460 F.2d 649, 652 (10th Cir.1972). A district court conducting a 10(j) hearing is asked to assess the harm that may occur during the course of the ensuing administrative proceedings and "the *probability* that the General Counsel will succeed in convincing the NLRB that someone has in fact violated the labor laws." *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir.1989) (emphasis added); *see also Kinney v. International Union of Operating Eng'rs, Local 150*, 994 F.2d 1271 (7th Cir.1993). The court's goal is to " 'minimize the costs of being mistaken,' all things considered." *Pioneer Press*, 881 F.2d at 490 n. 3 (citation omitted). The court therefore must attempt to predict what the eventual outcome of the Board's proceedings will be and to act accordingly. If the eventual outcome turns out to be different from what was predicted, however, it is obviously the prediction, not the outcome, that must be rejected.

■ Additionally, the record supports the Board's finding that Q–1 violated section 8(a)(1) by soliciting grievances and promising benefits at the May 19 meeting that could reasonably appear, when viewed from the drivers' perspective, to be aimed directly at interfering with the union organization efforts. *See id.* After months of pressure to increase the drivers' compensation, Q–1 finally announced an increase at the May 19 meeting, at the height of the union organizing campaign. Especially in the context of the Company's open hostility to unionization, such timing might reasonably appear to be part of the Company's continuing efforts to interfere with the employees' organizational activities.

### 2. *Section 8(a)(3) Violations*

■ Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate against an employee "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1988). An employer violates section 8(a)(3) if it discharges an employee because of her union activities. *Id.* In considering 8(a)(3) allegations, the Board may properly consider such circumstantial evidence as whether the employer committed other unfair labor practices or otherwise expressed anti-union animus in the period shortly before the dismissals. *Livingston Pipe & Tube Inc. v. NLRB*, 987 F.2d 422, 426 (7th Cir.1993). At that point, "'[o]nce the general counsel establishes that the employer was motivated by antiunion sentiment, the employer will be held in violation of the Act unless it can show that the same decisions would have been made absent the employee's protected 'activity.'" *Id.* (quoting *J. Huizinga Cartage Co. v. NLRB*, 941 F.2d 616, 620 (7th Cir.1991)).

■ The record contains substantial evidence that the discharged employees' union activities were a motivating factor in their discharge. Denham, Stevens, and Lupo were all fired closely on the heels of the organizing campaign and within three weeks of one another. No employee of Q–1 had ever previously been discharged. The Company made it known to each of them that it was aware of their pro-union activities, including the fact that Denham had been the one distributing authorization cards, and it threatened each of them with retaliation. President James E. Schroering even specifically threatened Stevens that he would fire "everybody" if that is what it took to keep the Union out of Q–1. Given these circumstances, we believe that substantial evidence supports the Board's finding that the General Counsel met its burden of establishing by a preponderance of the evidence that anti-union animus was a motivating factor in the Company's actions against these employees. *See id.* at 427.

Similarly, substantial evidence supports the Board's finding that the Company failed in its attempt to show that it would have made the same decisions in the absence of the employees' union activities. *See id.* The Company claims that the discharges occurred pursuant to its disciplinary procedures and were based on employee misconduct. The Company asserts that Denham had committed numerous log violations and, in particular, failed to report his whereabouts for over nineteen hours after making an eight-hour trip from Milwaukee. The ALJ, however, credited the testimony of numerous witnesses that the log violations were condoned by the Company and Denham's testimony that he had called the dispatcher at repeated intervals throughout his supposed nineteen-hour absence.

Stevens allegedly was discharged for not being available when he was supposed to be, after receiving prior discipline for damaging Q–1 equipment and falsifying a worker's compensation claim report. Stevens, like Denham, never received the alleged prior reprimands until the 10(j) hearing in October of 1991, and the record supports the ALJ's determination that the complaints were stale and "coupled with a fanciful version of events."

Finally, Q–1 asserts that it discharged Lupo for not being available for dispatch on May 22 because of drinking, and for failing to turn in paperwork from a particular trip to Milwaukee. The record shows, however, that the Company did not have a policy of

forced dispatch, that Lupo had not been drinking the night before, and that he supplied the necessary bill of lading when he went in for his last paycheck (having not been dispatched between the time of the trip in question and that point).

On the basis of the strong evidence of the Company's anti-union motivations and the weakness of the Company's alternative explanations for its conduct, we find that substantial evidence supports the Board's conclusion that Denham, Stevens, and Lupo would not have been discharged absent their union activities.

### 3. *Bias*

The Company responds to the Board's conclusions primarily by disputing the facts upon which the Board based its determinations. It presents on appeal an alternative version of the events outlined above and contends that the ALJ and the Board erred in crediting the testimony of the employee witnesses rather than the witnesses provided by Q–1. Based upon its alternative account, it argues that no unfair labor practices occurred. We reject Q–1's attempt to engage this Court in renewed factfinding, and we affirm the Board's findings.

Q–1 acknowledges that we will not overturn an ALJ's credibility determinations absent extraordinary circumstances, such as a showing of bias, utter disregard for uncontroverted sworn testimony, or the acceptance of facially incredible testimony. *See Central Transp.*, 997 F.2d at 1190; *see also Pittsburgh S.S. Co.*, 337 U.S. 656, 659–60, 69 S.Ct. 1283, 1285–86, 93 L.Ed. 1602 (1949). It urges, however, that the ALJ in this case displayed "constant antagonism towards Q–1's witnesses and counsel," and that his findings reflect "both his bias against Q–1 and his desire to credit the testimony of the General Counsel's witnesses at any cost."

■ We see no evidence of any bias or prejudicial conduct by the ALJ that would taint the administrative proceedings. Contrary to Q–1's assertion, it is not necessarily bias for an ALJ to credit all of the witnesses on one side of a dispute and none of the witnesses on the other. *Impact Indus., Inc.*

*v. NLRB*, 847 F.2d 379, 382 (7th Cir.1988); *Berger*, 678 F.2d at 687; *accord Conair Corp. v. NLRB*, 721 F.2d 1355, 1367 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984). As the Supreme Court observed in rejecting a similar argument years ago:

> [T]he facts disputed in litigation are not random unknowns in isolated equations—they are facets of related human behavior, and the chiseling of one facet helps to mark the borders of the next. Thus, in the determination of litigated facts, the testimony of one who has been found unreliable as to one issue may properly be accorded little weight as to the next. Accordingly, total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact.

*Pittsburgh S.S. Co.*, 337 U.S. at 659, 69 S.Ct. at 1285. In the case before us, the ALJ credited testimony by the employee witnesses that was mutually corroborative, given in some instances by witnesses who were no longer employed by Q–1 and thus had no motive to lie, and that, in the case of the alleged threats of reprisal, was borne out by events such as the firing of Denham, Stevens, and Lupo. On the other hand, the ALJ discredited the testimony of such Q–1 witnesses as President James E. Schroering, whose credibility was cast into doubt by his denial, in the face of overwhelming evidence, that Q–1 drivers were forced to falsify their Department of Transportation logs in order to meet the Company's tight delivery schedule.

"Credibility ... is a function not only of what a witness says but of how a witness says it, and the cold record before this court is a poor medium for conveying anything other than a witness's exact words." *Overnite Transp.*, 938 F.2d at 819. We see no "extraordinary circumstances" in the cold record before us that would lead us to conclude that the ALJ's decision to credit the employee witnesses warrants reversal.

### B. *The Bargaining Order*

■ Based upon its finding that Q–1 had committed numerous section 8(a)(1) and 8(a)(3) violations, the Board issued a bargain-

ing order that requires Q–1 to bargain in good faith with the Union. The Board has authority to issue such orders to combat unfair labor practices that "have the tendency to undermine majority strength and impede the election processes." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969); *see Justak Bros. & Co. v. NLRB,* 664 F.2d 1074, 1081 (7th Cir.1981). A bargaining order is justified if the Union "at one time" enjoyed majority status and "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies, though present, is slight." *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940. "The determination of the appropriateness of a bargaining order is, like all remedies, entrusted to the sound discretion of the Board." *Justak,* 664 F.2d at 1081. We will reverse the Board's order only if it constitutes an abuse of the Board's discretion. *See id.* at 1082.

### 1. *Majority Status*

Q–1 argues that the Union lacked majority support at the time the Union demanded recognition on July 18, 1991, and that therefore a bargaining order is impermissible. When a bargaining order is issued to remedy section 8(a)(1) and 8(a)(3) violations, however, *Gissel* requires a showing only that "at one time" the union had majority status—not that the union had a majority when it demanded recognition. *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940; *First Lakewood Assocs. v. NLRB,* 582 F.2d 416, 422 (7th Cir.1978).

■ The ALJ found that six of the eleven members of the bargaining unit, which consisted of all full-time and regular part-time truck drivers and driver-mechanics employed at the Clarksville terminal,[4] had signed union authorization cards as of May 19—before Denham, Stevens, and Lupo were fired and before Q–1 hired four new drivers. In addition, one card (Stevens') was filled out but not signed, and another (driver Homer Lon-

goria's) was not produced at the hearing, although Longoria testified that he had signed one. The ALJ and the Board concluded that the "at one time" criterion for majority status had been satisfied.

Q–1 contends, though, that even as of May 19, there was no majority. It argues that Stevens' and Longoria's authorizations were invalid and that one of the signed cards, Martin Suddeth's, should not have been counted because Suddeth was a mechanic, not a truck driver, and thus he was not part of the bargaining unit. We reject each of these challenges.

Longoria's testimony at the administrative hearing that he had completed an authorization card prior to May 19 and had given it to another driver for delivery to the Union is probative of the Union's . majority status, even though the card was later misplaced. *Cf. Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1150 n. 34 (3d Cir.1977) (affirming Board's inclusion of misplaced card in tally of majority status); *NLRB v. International Metal Specialties, Inc.,* 433 F.2d 870, 872 (2d Cir. 1970) (same), *cert. denied,* 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971). Similarly, we find no error in the ALJ's inclusion of Stevens' unsigned card among the majority. Stevens had filled out the card, printed his full name on it, orally affirmed his intent— both at the May 19 meeting and later at the hearing—that it be submitted to the Union with the other authorization cards, and credibly explained why he forgot to sign.[5] Under such circumstances, it was reasonable for the ALJ and the Board to conclude that the card was authentic and that Stevens " 'did, in effect, do what he would have done by voting in a Board election,' " *Medline Indus., Inc. v. NLRB,* 593 F.2d 788, 793 (7th Cir.1979) (citation omitted). Finally, we see no error in the ALJ's inclusion of Suddeth's card. The parties stipulated that the relevant bargaining unit included driver-mechanics, and the record shows that Suddeth fit that description.

---

**4.** The parties stipulated on the record to this characterization of the bargaining unit.

**5.** Stevens testified: "I just forgot to [sign], and what happened was, I was filling it out on the

hood of somebody's truck, and I was in a hurry because I was trying to listen to ... the discussion amongst the drivers, and it was a complete oversight on my part, but I did mean to put my signature on it."

Suddeth testified that in addition to his work as a mechanic, he made occasional freight deliveries, for which he was paid the same mileage rates as the other drivers. Q–1 has thus presented no evidence that would lead us to disturb the Board's finding that the Union did, indeed, have majority status as of May 19, 1991.

### 2. *Appropriateness of the Bargaining Order*

▆▆ Q–1 further argues that even if the Union did have majority status, the bargaining order was inappropriate for other reasons. In particular, it asserts that its alleged unfair labor practices centered around only three individuals, Denham, Stevens, and Lupo, who constituted only a small minority of the bargaining unit, and that the record does not otherwise support the Board's finding that a fair election would now be impossible. After careful consideration, we disagree.

A bargaining order is "strong medicine and is to be implemented with the utmost care." *Ron Tirapelli Ford, Inc. v. NLRB*, 987 F.2d 433, 439 (7th Cir.1993). Consequently, we have found it an abuse of the Board's discretion to impose a bargaining order without sufficient analysis and discussion of the adequacy of traditional remedies. *See Montgomery Ward & Co. v. NLRB*, 904 F.2d 1156, 1159 (7th Cir.1990). In this case, we believe the Board discharged its burden. It considered the severity of the unfair labor practices; the high-level management officials who committed them; the timing of the threats of discharge and plant closure, as well as of the promises to increase pay and address grievances; the fact that, in its view, all of the employees were affected; and the small size of the bargaining unit. In light of these factors, the Board concluded that "the possibility of erasing the effects of the Respondent's extensive and serious violations is slight and the holding of a fair election unlikely."

The Board's discussion is not a mere "summary conclusion," such as that disapproved of in *Montgomery Ward. See* 904 F.2d at 1159. Instead, it is a delineation of factors, supported by the record, that we have repeatedly found sufficient to justify a bargaining order. *See Ron Tirapelli Ford*, 987 F.2d at 441 & n. 10; *Berger*, 678 F.2d at 69; *Justak*, 664 F.2d at 1082. As we said in *Justak*, in describing the impact of unfair labor practices that are remarkably similar to those before us (including the termination of exactly three pro-union employees):

> The probable impact of unfair labor practices is increased when a small bargaining unit is involved. The Company's violations are not minor. It engaged in surveillance of union activities, discharged pro-Union employees, threatened layoffs ... and both promised and granted benefits to thwart unionization. Threats were not only made but executed. ("Actions speak louder than words," as the administrative law judge noted.) Under such circumstances, and after a careful review of the record, we fully agree with the Board that a bargaining order is an appropriate remedy.

664 F.2d at 1082 (citations omitted). The same can be said here.

▆▆ Q–1 contends that the Board has not shown how Q–1's alleged violations would interfere with the holding of a fair election. The Board, however, is not required to explain with scientific accuracy the impact of unfair labor practices. *Id.* at 1081. It need only list the factors that it considers in making its determination that a bargaining order is warranted and describe how these factors have been weighed against the efficacy of less drastic remedies. *See id.; see also Ron Tirapelli Ford*, 987 F.2d at 441 (describing Board's balancing of interests). At some point, "common sense recognizes the dramatic and long term effects of such threats" as were made here. *Justak*, 664 F.2d at 1082. Q–1's highest management demonstrated in unmistakable terms to all of the employees, not just the three who were actually discharged, that union activity would not be tolerated and that those who participated were being watched and would be punished, to the point of losing their livelihoods. Such a chilling lesson can be expected to persist and pervade the labor-management relations at Q–1, both in the memories of those who were there and in the lore of the shop after

they leave.[6] In such circumstances, a bargaining order is not an abuse of the Board's discretion.

## III. CONCLUSION

This is not a difficult case. The findings of the ALJ, as adopted by the Board and affirmed here, demonstrate a persistent and pervasive campaign on the part of Q–1 to prevent its employees from exercising their rights to unionize under the National Labor Relations Act. Q–1 management expressed open hostility to the organizational efforts and to the organizers themselves—impermissibly coupling their expressions of views with threats of reprisal and with actual retaliation. Such conduct constitutes a blatant violation of sections 8(a)(1) and 8(a)(3) of the Act. We see no abuse of the Board's discretion in its determination that a fair election would not be possible at Q–1 and that a bargaining order is necessary. Accordingly, we *deny* Q–1's petition for review and *enforce* the Board's order.

ENFORCED.

COFFEY, Circuit Judge, dissenting.

"We will not overturn an ALJ's credibility determinations absent extraordinary circumstances. These [extraordinary circumstances] include a clear showing of bias by the ALJ, utter disregard for uncontroverted sworn testimony, or acceptance of testimony which on its face is incredible." *Central Transport, Inc. v. National Labor Relations Bd.,* 997 F.2d 1180, 1190 (7th Cir.1993) (citing

*NLRB v. Advance Transp. Co.,* 979 F.2d 569, 573 (7th Cir.1992); *NLRB v. So–White Freight Lines, Inc.,* 969 F.2d 401, 407 (7th Cir.1992)). The law is equally clear that we will affirm the Board's findings of fact if they are supported by "substantial evidence on the record considered as a whole." *Central Transport,* 997 F.2d at 1184. In most cases, an ALJ's credibility findings would withstand a challenge that he was biased if the findings were supported by substantial evidence. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951); *Kopack v. NLRB,* 668 F.2d 946, 952–54 (7th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982). In this case, the respondent-appellant, Q–1 Motor Express, presents a compelling argument that the ALJ was in fact biased because the ALJ reached the exact opposite conclusion regarding the credibility of the witnesses than did the experienced U.S. district court judge who, after hearing testimony in open court from the same principal witnesses, *see infra* note 2, refused to grant the NLRB a preliminary injunction pending the outcome of the administrative hearing.[1]

I realize that the factual findings made by a trial judge in a 10(j) injunctive proceeding are not binding on the ALJ or the Board, *National Labor Relations Bd. v. Acker Indust., Inc.,* 460 F.2d 649, 652 (10th Cir.1972), however, it causes me concern when an experienced U.S. district judge and an NLRB administrative law judge reach such conflicting conclusions as to witness credibility after

---

6. Our conclusion is thus not altered by Q–1's assertion in its brief, made without reference to any evidence in the record, that all but one of the original employees of the bargaining unit has by this time left Q–1. While changes in circumstances over a long period of time are relevant to determining the propriety of a bargaining order, *see Montgomery Ward,* 904 F.2d at 1160, "[i]t is well settled ... that the Board may issue a bargaining order even if the Union represents only a minority when the order is entered," *Justak,* 664 F.2d at 1082 (citing *Gissel,* 395 U.S. at 610, 89 S.Ct. at 1938). Where, as here, the employer's misconduct is pervasive and likely to persist despite employee turnover, a bargaining order still may better preserve and foster employee free choice than other, traditional remedies. *Id.; see also Amazing Stores, Inc. v. NLRB,* 887 F.2d 328, 331 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1029,

110 S.Ct. 1477, 108 L.Ed.2d 614 (1990). Moreover, it appears that even if the employees have changed, Q–1's management remains the same. Thus, repetition of the illegal practices appears more likely here than in *Montgomery Ward,* where only one of thirteen managers remained, *see* 904 F.2d at 1160, or than in *Impact Industries,* where among the changed circumstances deemed relevant was the fact that the management had completely changed, *see* 847 F.2d at 383.

1. Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), permits a party to seek injunctive relief pending final Board action. In this case, the NLRB sought to enjoin Q–1 from engaging in further unfair labor practices and to require Q–1 to reinstate the three wrongfully discharged employees.

hearing the testimony of essentially the same witnesses.[2] Following the testimony of the truck drivers and the Q–1 management, the U.S. district judge stated, "Generally, this court finds that Q–1 Motor Express' witnesses were more credible than the petitioner's witnesses; the drivers' testimony appeared to the court to have been 'scripted,' having been uniform in many details that would otherwise naturally yield to certain inconsistencies, and less than candid." The ALJ, without giving an explanation as to why his credibility findings were directly opposed to those of the respected trial judge, credited the testimony of the drivers over that of Q–1 President Schroering throughout his decision. This inconsistency is especially troublesome in light of the fact that the hearing before the district judge occurred several months prior to the hearing before the ALJ and thus the witnesses' memory and recollection of events, under usual circumstances, would be clearer and much more vivid when they testified in district court.

In addition to the variance in the credibility findings, there were several findings made by the ALJ suggesting that he was in fact biased against Q–1 management. The Board properly "disavowed" each of these findings, yet affirmed the ALJ's holding against Q–1. For instance, the ALJ based his decision against Q–1, in part, on six violations of § 8(a)(1) that the NLRB did not even allege in its complaint. The Board dismissed the ALJ's six additional findings against the employer because Q–1 did not have fair notice of these alleged violations. The fact that the ALJ went far beyond the complaint in search of additional violations against the employer strongly infers that he was less than objective about the NLRB's case. Second, the ALJ found one § 8(a)(1) violation against Q–1 based on dispatcher Leah Conrad's report to President James E. Schroering that union cards were being distributed. The Board disavowed this finding because both Conrad and Schroering were supervisors and there

were no employees (truck drivers attempting to unionize) present at the time the conversation occurred. Since no employees were present, the Board ruled the comments could not constitute an attempt to "interfere with, restrain, or coerce employees in the exercise of the right[ ]" to organize. 29 U.S.C. § 158(a)(1). Once again, this finding, which the Board disavowed, reveals the ALJ's potential bias against Q–1. Third, the ALJ concluded that because James E. Schroering consulted his attorney before discharging Donald Denham it "suggest[ed] that [Schroering] was plotting his course carefully from the outset," i.e., that he was seeking to disrupt attempts at unionizing without running afoul of the law. The Board rejected this finding because merely seeking the advice of counsel before discharging an employee does not suggest antiunion animus but rather is a sound business decision in this climate of increasing employee lawsuits against employers. The fact that the ALJ interpreted Schroering's consulting with his attorney as an indication of the president's hostility toward the union is further evidence that the ALJ viewed the record with a jaundiced eye. Finally, the Board disavowed, without elaboration, the ALJ's finding that there was a § 8(a)(5) violation as of May 19, 1991.

These four express instances of the Board rejecting the findings of the ALJ (each finding against Q–1), provide additional evidence that the ALJ had a bias against Q–1. He was not satisfied with the NLRB's case against Q–1 so he took it upon himself to manufacture more charges and construe the evidence in the light most unfavorable to Q–1 rather than in a neutral and impartial fashion.

Based on the irreconcilable credibility findings of the district judge and the ALJ as well as the four instances of bias (which the Board "disavowed"), I would reverse the

2. As mentioned in the majority opinion we lack a transcript of the 10(j) proceeding, but the U.S. district judge made express reference to the testimony of James E. Schroering, president of Q–1; Donald R. Denham, Dan W. Stevens, and Anthony Lupo, the discharged Q–1 drivers; Leah Conrad, the Q–1 dispatcher; her husband Mark Conrad, who was another Q–1 driver; as well as James Hogan, another Q–1 driver. The NLRB brief before this court only listed three witnesses that testified before the ALJ that did not testify in district court: Homer and Sandra Longoria and Shirley Glisson.

Board's order and remand for a new factual hearing in front of a different, impartial ALJ. When considering the totality of the evidence, as we must, the evidence of bias certainly casts doubt on his decision. At the very least, a remand is necessary for the Board to explain why it accepted the ALJ's credibility findings without even referring to the trial court's credibility findings. Although the result after remand might very well be the same, the appellant is entitled to have its day in court and receive an explanation from the Board as to how it reconciled these inconsistent findings. In our judicial system, "justice must satisfy the appearance of justice" and administrative agencies, as well as administrative law judges, must avoid even the appearance of bias or partiality. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

DISSENT.